Form No. TDF 62-03.5
(03/97 Edition)



| | FOR OFFICE USE ONLY |
|---|---|
| | DEPARTMENT CASE NUMBER |
| | FILING DATE |

# INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION
## WITH THE DEPARTMENT OF THE TREASURY

## Part I Complainant Identification

**1. Name** *(Last, First, Middle Initial)*
CARMONA, MARIA V.

**2. Telephone/Fax** *(Include Area Code)*
Home: ~~————————~~ NA
Work: 202-927-6345    Fax: NA

**3. Present Home Address** *(You must notify the Department of any changes of address while complaint is pending, or your complaint may be dismissed)*

PO BOX 454
Street Address

FULTON    MD    20759
City    State    Zip Code

**4. If you are a current or former employee of the Federal government, list your most recent title, series, and grade.**

SUPERVISORY AUDITOR
AUDIT MANAGER    GM 511    14
Title    Series    Grade

**5. Name and Address of Organization Where You Work** *(if a Treasury Employee)*
OFFICE OF INSPECTOR GENERAL
Bureau

AUDIT DIRECTORATE, BANKING AND FISCAL SERVICE
Office and Organizational Component

740 15TH STREET
Street Address

WASHINGTON    DC    20220
City    State    Zip Code

**6. Employment Status in Relation to this Complaint**
☐ Applicant  ☐ Employee  ☒ Former/Current Employee
☐ Former Student    NA
☐ Retiree    NA
☐ Other    NA

**7.** I certify that all of the statements made in this complaint are true, complete and correct to the best of my knowledge and belief.

*Maria V Carmona*    DEC 18, 2000
Signature of Complainant or Attorney Representative    Date

## Part II Designation of Representative

**8.** You may represent yourself in this complaint or you may choose someone to represent you. Your representative does not have to be an attorney. You may change your designation of a representative at a later date, but you must notify the Department immediately in writing of any change, and you must include the same information requested in this Part.

"I hereby designate: J. STEVEN ELBELL (Please Print Name) to serve as my representative during the course of this complaint. I understand that my representative is authorized to act on my behalf."

**9. Representative's Mailing Address**

J. STEVEN ELBELL
Firm/Organization

PO BOX 454
Street Address

FULTON    MD    20759
City    State    Zip Code

**10. Representative's Employer** *(if Federal Agency)*

N/A

**11. Representative's Telephone/Fax** *(Include Area Code)*
301 490 4328    N/A
Telephone    Fax

*Maria V Carmona*    DEC 18, 2000
**12. Complainant's Signature**    Date

GOVERNMENT EXHIBIT
1
05-1194

## Part III Alleged Discriminatory Actions

**13. Name and Address of Treasury Bureau that took the action at issue (if different than item 5.)**

N A

Bureau:                          Office and Organizational Component

Street Address

City                    State                    Zip Code

**14. If your complaint _____ for a position, please _____**

N A

Position Title:

Vacancy _____

**15. (A) Describe the action taken against you that you believe was discriminatory _____ the name of each person responsible for the action; (C) Describe _____ applicants because of your race, color, religion, sex, national origin ____ EEO process of opposition to alleged discriminatory practices; (D) _____ as a remedial resolution. (You may but are not required to attach _____)**

SEE ATTACHED

- [ ] _____
- [ ] _____
- [ ] _____
- [x] Sex        FEMALE
- [x] N_____     HISPANIC

- [x] _____        OCTOBER 8, 1952
- [ ] _____
- [x] _____        STARTING SEPT 1995 - CONTINUOUS

**17. _____**

TO BE DETERMINED FOLLOWING A COMPLETE INVESTIGATION OF ALL CLAIMS HEREIN AND DEVELOPMENT OF A COMPLETE FACTUAL RECORD

## Part IV Counselor Contact

**18. When did the _____ discriminatory event occur?**
SEPT     25     2000
Month        Day        Year

**19. When did you first become aware of the alleged discrimination?** SEPT 25 2000
Month        Day        Year

**20. When did you contact an EEO counselor?** INITIATED
SEPT     25     2000    PROCESS
Month        Day        Year

**21. Did you discuss all actions raised in item 15 with an EEO counselor?** [ ] YES [x] NO
(If no, explain attached sheet)

**22. Name and telephone number of EEO counselor.**
COUNSELOR NOT ASSIGNED
Name                    Telephone No.

**23. When did you _____ receive _____ of right to File?**
REQUESTED     NOV 1, 2000
Month        Day        Year

**24. On this _____ against whom?**

Name(s): _____        [ ] Yes [x] No
Agency(ies): _____        [ ] Yes [x] No
Court(s): _____        [ ] Yes [x] No

If you filed _____ was filed, case number, and _____

N A

EEO COUNSELING REPORT – INDIVIDUAL COMPLAINT
PART I (Through Initial Interview)
(Follow separate instructions and use a continuation sheet if necessary)

| 1. Regional Complaints Center Name, Address and Telephone Number | 2. EEO Officer Name, Address and Telephone Number | 3. EEO Counselor Name, Address & Telephone Number | 4. Date Counseling First Sought |
|---|---|---|---|
| WASHINGTON 800 K STREET #640 WASH, DC 20001 1-202-377-6730 | NONE | NONE | SEPT 25, 2000 |
| | | | 5. Date of First Interview |
| | | | NONE |

| 6. Employee or Applicant: Name, Business or Home Address. Employee: Official title, Series & Grade. |
|---|
| MARIA V. CARMONA PO BOX 454 FULTON, MD 20759    SUPERVISORY AUDITOR GM-511-14 |

**7. Basis or Type of Discrimination**

☒ Age
Date of Birth  ☐ Religion  ☐ Color  ☐ Race
8/10/52
D/M/Y

☒ National Origin   ☒ Sex   ☐ Other
HISPANIC         FEMALE

☒ Retaliation/ Reprisal for Involvement in Complaints Process

Handicap:
☐ Mental
☐ Physical

**8. Matter Causing Complaint or Issue**

☐ Appointment
☒ Assignment of Duties
☒ Awards
☐ Change to Lower Grade
☐ Classification
☐ Conv to F/T CC
☐ Duty Hours
☒ Eval-Appraisal Merit Pay
☐ Eval-Appraisal Non Merit Pay
☐ Exam/Test
☒ Harassment
☐ Overtime

☒ Pay
☒ Promotion
☒ Reassignment
☐ Reinstatement
☐ Removal/ Separation
☐ Reprimand
☐ Resignation
☐ Retirement
☐ Sexual Harassment
☐ Suspension
☐ Termination During Probation
☐ Time/Attendance

☒ Training
☒ Within Grade Increase
☒ Working Conditions
☒ Other (Explain)
HOSTILE WORK ENVIRONMENT

9. An EEO Counselor cannot reveal the identity of a person who has come for counseling, except when authorized to do so by the person counseled. Is Complainant willing to have his/her name revealed during the counseling stage? Yes ☐ No ☐ N/A. If answer is "Yes," Complainant must give permission by signing name in the space following:
CONFIDENTIALITY VIOLATED

_____
Signature of Complainant

| 10. Organization Where Alleged Discrimination Occurred and Date of Occurrence. SEPT 25, 2000 OFFICE OF INSPECTOR GENERAL DEPARTMENT OF THE TREASURY | 11. Give date Complainant became aware of alleged discrimination if substantially different from that shown in 10. Explain N/A |
|---|---|

12. If complaint appears to be untimely, what explanation is offered to explain why Counselor was not contacted within 30 days?
N/A

13. Provide a brief description of complaint, summarizing actions which caused counseling to be sought and which complainant believes are discriminatory.  SEE ATTACHED

14. Remedial Action Desired by Complainant TO BE DETERMINED FOLLOWING A COMPLETE INVESTIGATION OF ALL CLAIMS HEREIN AND DEVELOPMENT OF A COMPLETE FACTUAL RECORD

15. On the same matter has Complainant filed a grievance under a negotiated grievance procedure? Yes ☐ No ☒
Under the Agency grievance system? Yes ☐ No ☒
Has Complainant appealed to the Merit Systems Protection Board? Yes ☐ No ☒
If grievance or appeal has been filed, what is its status?

| 16. Does Complainant elect to have a representative? Yes ☒ No ☐  J. STEVEN ELDELL PO BOX 454 FULTON, MD 20759 | 17. Signature of Counselor and Date Signed N/A |
|---|---|

TD F 62-03.1 (03/87) PREVIOUS EDITION TD F 67.13.1 (06/85) OBSOLETE.

## DESIGNATION OF REPRESENTATIVE AND LIMITED POWER OF ATTORNEY

I hereby appoint the following named individual or organization as my Representative:

J. STEVEN ELBELL                          1-301-490-4328
_____          _____
Name (Individual or Organization)        Telephone No.

PO BOX 454
_____
                    Address (Number and Street)

FULTON                      MD              20759
_____      _____    _____
City                         State           Zip Code

   The Representative is authorized as attorney in fact to represent me in all respects
in connection with any and all my currently pending complaints of discrimination. Among
other things, the Representative is authorized to:

1. Appear, assist and counsel me in the preparation of my complaint of discrimination.

2. Appear for me or with me at hearings or other proceeding when his/her presence is
   authorized by Civil Service or Treasury regulations; and

3. Receive any information concerning my complaint of discrimination, including cor-
   respondence, copies of documents, reports of investigations, or reports of hearings
   to which I am entitled under Civil Service or Treasury regulation pertaining to com-
   plaints of discrimination.

4. Negotiate and finally resolve, adjust and/or settle any and all of my complaints of
   discrimination.

Maria V Carmona                          Dec 18, 2000
_____          _____
Signature                                Date

Maria V Carmona
_____
Print Name

### CANCELLATIONS OF DESIGNATION

1. This designation and limited power of attorney may be cancelled by the complainant
   or by the individual or organization named above upon written notice to the appropriate
   Bureau or Center EEO Officer.

2. A subsequent designation and limited power of attorney, if properly executed on this,
   or similar form, and sent to the appropriate Bureau or Center EEO Officer automatically
   cancels a previous designation.

3. The complainant is responsible for notifying his representative and the agency when
   the designation and limited power of attorney is cancelled.

TDF 67-13.2 (06/85)

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

# LIST OF CURRENT EEO CLAIMS

Below is a list of current Equal Employment Opportunity (EEO) Claims for the filing of a twelfth Formal EEO Complaint by Maria V. Carmona on December 18, 2000. Ms. Carmona's current EEO claims are discussed in more detail in the following pages.

An overarching claim in this and the other eleven formal EEO complaints Ms. Carmona has been forced to file is the clear **long-term pattern and practice of discrimination, retaliation, and a hostile work environment** directed against Ms. Carmona by the Department of the Treasury.

1. Assignment of Office Space and Furniture at the ABA Building in a Disparate Manner
2. Manipulation of Personnel System in Violation of Merit System Principles
3. Failure to Provide Opportunity for Promotion
4. Preferential Selection of Non-Minority White Candidates for Senior Management Positions
5. Failure to Properly Address EEO Concerns
6. Failure to Provide Requested Management and Other Professional Training
7. Placement in Non-Pay Status
8. Failure to Provide Notifications of Personnel Action in a Timely Manner
9. Failure to Correct Overpayment in a Timely Manner
10. Failure to Assign Appropriate Staffing
11. Failure to Properly Present Results of Work
12. Failure to Implement Hispanic Employment Initiatives
13. Failure to Address EEO-Related Issues Identified by 1989 Task Force
14. Failure to Address Other Previously Identified EEO-Related Issues
15. Inspector General Focus on One Minority Group
16. Department of the Treasury EEO Training Material Fosters Misconceptions About Hispanics
17. Failure to Properly Administer EEO Requirements
18. Breach of Confidentiality
19. Preferential Treatment of Non-Minority White Employees
20. Actions that Pit One Minority Group Against Another
21. Other Indications of Discrimination, Retaliation, and a Hostile Work Environment

> **Please note that a proper and complete investigation of the preceding current EEO claims may give rise to further claims that are not specifically stated at this time. Ms. Carmona reserves the right to include these relevant and material claims upon their identification.**

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

# BRIEF BACKGROUND

Maria V. Carmona is a Hispanic White Female, GM-511-14, Age 48, currently employed by the Department of the Treasury Office of Inspector General as a Supervisory Auditor, functioning as an Audit Manager in *Banking and Fiscal Service* within the Office of Audit. Ms. Carmona has more than 16 years of service with the Department of the Treasury Office of Inspector General and is in her 25th year of Federal service.

During her career with the Office of Inspector General, Ms. Carmona has had extensive and varied experience with many of the Treasury Bureaus, in Program Audit, Financial Statement Audit, and Oversight capacities. She has been responsible for internal quality assurance and external peer review functions. Ms. Carmona has reported under the direction of several individual members of the Senior Management Group, while consistently receiving excellent performance appraisals. She has received numerous peer, performance, and special act awards. Ms. Carmona has been called upon many times during her career with the Office of Inspector General to head up highly sensitive, visible, and time-critical assignments.

In addition, Ms. Carmona has been temporarily promoted to the Grade 15 for two *not to exceed 120 days* periods, the first as the Acting Director of *Quality Assurance* in 1993 and the second as the Acting Director of *Finance and Debt* in 1999. Ms. Carmona was highly complimented for her achievements during both of these assignments, and most recently was asked to continue functioning in the Acting Director role for 2-1/2 months after the temporary promotion period ended. Please also note that Ms. Carmona made the best qualified list for an Inspector General position with another agency in 1993. It should also be noted that a member of the President's Council on Integrity and Efficiency/ Executive Council on Integrity and Efficiency (PCIE/ECIE) was on the independent rating panel that placed Ms. Carmona on that best qualified list.

Ms. Carmona's situation is clearly indicative of the **glass ceiling** that exists for Hispanic White Females within the Department of the Treasury, no matter how well they perform. Ms. Carmona finds herself in the position of filing her twelfth formal EEO complaint against the Department of the Treasury due to a clear long-term pattern and practice of discrimination, retaliation, and hostile work environment directed against her during her career with the Department of the Treasury.

The Office of Inspector General has not made progress since its Recruitment Task Force issued its report in October 1989 [Attachment I] and the Office of Personnel Management (OPM) issued its Work Force Effectiveness Study report in October 1995. This OPM report raised the issue of a glass ceiling that limits the advancement of most qualified minorities to top positions in the Office of Inspector General, an organization in which only 20 percent of survey respondents agreed with the statement that competition for jobs is fair and open.

---

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

On September 25, 2000, Ms. Carmona, in good faith, contacted Bobbie Sisselberger, who at the time it was Ms. Carmona's understanding was the Office of Inspector General EEO Officer, with the intent of initiating her twelfth EEO process. Ms. Sisselberger informed Ms. Carmona at that time that she was no longer the EEO Officer, that she had been relieved of this duty as of August 13, 2000, and that she no longer had a role in the EEO process.

Please note that in later discussions between Susan Morris of the Secretary of the Treasury's EEO staff and J. Steven Elbell, Ms. Carmona's representative, it was confirmed by Ms. Morris that Ms. Sisselberger was not and is not the Office of Inspector General EEO Officer. Ms. Morris also confirmed the fact that there currently does not exist an Office of Inspector General EEO Officer.

It is clear that Ms. Carmona's unknowing contact with Ms. Sisselberger regarding her EEO concerns was a breach of Ms. Carmona's confidentiality regarding her good faith attempt to initiate the instant EEO process and, as such, was a direct violation of Ms. Carmona's rights. Ms. Carmona was following guidance that had been given to Office of Inspector General (OIG) staff during May 1997, which stated that employees were required to contact the OIG EEO Officer, Ms. Sisselberger, for assignment of an EEO Counselor.

It is also a fact that at the time of Ms. Carmona's initial contact with Ms. Sisselberger, Office of Inspector General EEO posters stated that employees may contact Ms. Sisselberger, the OIG EEO Manager. It is a fact that this identification of Ms. Sisselberger continued and, as of December 15, 2000, continues to appear on posters distributed throughout the Office of Inspector General, even though Ms. Sisselberger clearly no longer has a role in the EEO process and even though no EEO Officer has been appointed. See Attachment B for a reduced photocopy of the 18" x 22" EEO poster [B-1] and for a copy of the May 1997 memorandum [B-3].

It should be noted that Ms. Carmona's EEO rights have been violated in the past, as was brought to the attention of the Department of the Treasury and to the attention of the Equal Employment Opportunity Commission (EEOC) in Ms. Carmona's filings of previous formal EEO complaints. It should be noted that Ms. Carmona is aware of at least two other serious breaches of her confidentiality, by two Department of the Treasury EEO Counselors dealing with separate and distinct matters.

In addition, Office of Inspector General staff are continuing to contact Ms. Sisselberger as if she were the EEO Officer. As such, each individual's contact with Ms. Sisselberger is a breach of that individual's confidentiality. It is Ms. Carmona's understanding that there is no policy or direction being given to Office of Inspector General employees regarding their inappropriate contact with Ms. Sisselberger to initiate the EEO process and the fact that it would be a breach of confidentiality to do so.

These breaches of confidentiality demonstrate the Department of the Treasury's complete disregard for even the most basic EEO precepts.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

On October 18, 2000, following Ms. Carmona's initial September 25 contacts first with Ms. Sisselberger and then with Emilie Baebel, who is Ms. Sisselberger's SES-level manager, the result of which had been the non-assignment of an EEO Counselor and no direction on how Ms. Carmona should proceed, Ms. Carmona hand-delivered a letter addressed to Lawrence H. Summers, Secretary of the Treasury, requesting assignment of an EEO Counselor due to the continuing long-term pattern and practice of discrimination, retaliation, and hostile work environment directed towards Ms. Carmona by the Department of the Treasury. [Attachment A (A-1)]

Please note that Ms. Carmona's October 18 contact with Secretary Summers was still within the 30-day EEO counseling period designated by the EEOC. Please note that, by this time, Ms. Carmona had waited 3 weeks for the Office of Inspector General to advise her on what to do. In her October 18 letter, Ms. Carmona also expressed concerns about the Department of the Treasury's EEO program.

The fact that Ms. Carmona first contacted Ms. Sisselberger on September 25 in good faith to initiate her EEO process only to be informed that Ms. Sisselberger was no longer the Office of Inspector General EEO Officer, that Ms. Carmona on the same day contacted Ms. Baebel to inquire into the status of an EEO Officer only to be informed that in fact no Office of Inspector General EEO Officer existed for Ms. Carmona to contact, and that no Departmental direction was provided to Ms. Carmona on how to proceed, clearly demonstrates negligence on the part of the Department of the Treasury in its EEO program and, as such, is a direct violation of Ms. Carmona's rights.

On the afternoon of Friday, October 27, 2000, Mr. Elbell received a voice mail, with no subject stated, from an individual only identifying herself as Susan Morris and asking that Mr. Elbell call her on Monday. At that time, Mr. Elbell had no idea who Susan Morris was or what the subject matter may be. Mr. Elbell, only having received a voice mail to call someone, may just as easily have ignored the request.

On the morning of Monday, October 30, 2000, Mr. Elbell called Ms. Morris, who then explained that she was part of Secretary Summers' EEO staff, that she was assigned the responsibility of assigning an EEO Counselor for Ms. Carmona, and that she had called Mr. Elbell because he was identified as Ms. Carmona's representative in the October 18 letter. Ms. Morris went on to state that the sole purpose for her call was to inform Ms. Carmona that she was still working on the assignment of a Counselor, and that no EEO Counselor was as yet available. Mr. Elbell stated to Ms. Morris that the 30-day EEO counseling period had expired, a fact with which Ms. Morris agreed, and to which Ms. Morris responded that Ms. Carmona had the option of granting an extension to the 30-day period.

After consultation with Ms. Carmona regarding her options as presented by Ms. Morris to Mr. Elbell, Ms. Carmona, on November 1, 2000, hand-delivered a letter addressed to Secretary Summers, in which she stated, in part, that she would not be granting an extension to the 30-day EEO counseling period and that she respectfully requested, for timeliness purposes, her Notice of Right to File an EEO Complaint. [Attachment A (A-3)]

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Ms. Morris was promptly informed of Ms. Carmona's decision and of this letter by Mr. Elbell on the morning of November 1. During that discussion, Ms. Morris requested that Mr. Elbell ask Ms. Carmona to reconsider her November 1 request. Mr. Elbell did so, and on the morning of November 2 informed Ms. Morris, via voice mail, that Ms. Carmona would not be extending the counseling period and was staying with her November 1 request of Secretary Summers for her Notice of Right to File an EEO Complaint.

As stated in EEO Management Directive MD-110, Chapter 2, Section VI.C.2, the 30-day EEO counseling period commences when the aggrieved person first contacts the appropriate agency office and exhibits an intent to begin the EEO process, which Ms. Carmona did on September 25, 2000, with contact with Ms. Sisselberger, and with which the Department of the Treasury agrees. The unavailability of an EEO Counselor does not toll the 30-day counseling period. Any time following the designated 30-day counseling period, and in the absence of an extension being granted by the aggrieved party, the aggrieved party may request its Notice of Right to File, which Ms. Carmona properly did on November 1, 2000. [Attachment A (A-3)]

**The Department of the Treasury's refusal to comply with the regulations and provide Ms. Carmona with her properly requested Notice of Right to File is a direct violation of Ms. Carmona's rights.**

Ms. Carmona has waited in good faith for six weeks since she requested her Notice of Right to File, and almost three months since she first initiated the EEO process, for the Department of the Treasury to honor her request and comply with the regulations, or attempt to resolve her concerns. At this time, and in the interest of timeliness, Ms. Carmona has no choice but to file this formal EEO complaint.

In filing this complaint, Ms. Carmona has very serious concerns about retaliation, particularly in light of comments that Inspector General Jeffrey Rush, Jr., made to Office of Inspector General employees at the West End Court building during a Town Hall Meeting on September 21, 1999. With reference to employees having concerns about serving suspensions of two weeks without pay, Inspector General Rush said to the staff, *I'm the final word on most of the discipline around here,* so, if something *is clear cut, why even come see me?* He went on to say that he knows about the MSPB because he has *been there,* that the head of the OSC is *"a friend of mine,"* and that he has been before the District Court. Inspector General Rush then went on to say that when employees file formal actions, such as EEO complaints, it is not just him they are taking on, it is the *entire United States Government* they are taking on.

Ms. Carmona perceived these remarks as very threatening and as clear attempts at intimidation of all members of the Office of Inspector General, with a strong implication that if an individual filed an EEO complaint or other Personnel action, his or her career would be ruined. Ms. Carmona felt particularly threatened in the context of having eleven formal EEO complaints pending at that time and of having pursued concerns with the entities that Inspector General Rush mentioned, including the OSC (Office of Special Counsel) and the MSPB (Merit Systems Protection Board), as well as

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

with other Federal organizations, including the U.S. Court of Appeals for the Federal Circuit and the U.S. Supreme Court.

The fact that the Office of Inspector General does not have an EEO Officer and currently has an announced process that violates confidentiality makes the situation worse and serves as a clear indication of the Inspector General's non-compliance with the equal employment rights of Office of Inspector General employees. These threatening and clear attempts at intimidation are direct violations of Ms. Carmona's clear administrative and legal rights to pursue her EEO and other employment concerns with the proper authorities.

The U.S. Congress has pointed out that there are some serious concerns with reference to the Office of Inspector General and with Inspector General (IG) Rush. For example, during the June 29, 1999, Senate Finance Committee confirmation hearings for Inspector General Rush, Senator William V. Roth, Jr., stated that *the Treasury IG has had some very serious management problems in the past*, and that *the IG office was very troubled*. Senator Roth also stated, with reference to Inspector General Rush, that *in one of your prior responsibilities, there was some question about whistleblowers. What will you do to encourage whistleblowers to come forward and to assure that those that do, there's no retaliation against them?*

The comments made by Inspector General Rush during the Town Hall Meeting were certainly threatening to anyone who would blow the whistle on improper activities, whether through the EEO process or by bringing issues before other Federal entities. And the fear of retaliation is very real for Ms. Carmona and for others within the Office of Inspector General.

Ms. Carmona has experienced severe retaliation first-hand since she first raised issues of direct violations of law in 1994, since she raised issues of equal employment opportunity in 1995, and since she addressed concerns to the Office of Special Counsel in 1996.

Inspector General Rush responded to Senator Roth, in part, by stressing the need for *putting the right people at the point of direct contact with complainants, and giving them some assurance that we're going to handle their complaints in a responsible way*. This certainly is not happening with the lack of an EEO Officer and the clear violation of confidentiality within the Office of Inspector General.

It should be noted that there are many Office of Inspector General employees with EEO concerns. In fact, the Office of Inspector General itself, in its report titled *Affirmative Employment Program for Minorities and Women - FY 1999*, which is included as Attachment C, acknowledged that the *OIG also suffered an inordinate number of equal employment opportunity (EEO) complaints and grievances* [C-4] and that there was *significantly high turnover* [C-5].

Data provided by the Department of the Treasury Office of Inspector General indicate that during Fiscal Year (FY) 1999, 60 of 270 staff on board at the beginning of the year left the organization. While not as high as this 22 percent loss of staff in FY 1999, another 13-14 percent of the employees

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

reportedly left during FY 2000, and a significant number have already announced that they are leaving during FY 2001. This high turnover is indicative of the very troubled environment that exists within the Office of Inspector General. [*Weekly Highlights*[1] - September 27, 2000]

In addition, Carlton Hadden, at the time the Acting Director of the EEOC Office of Federal Operations, stated during an EEOC Town Hall Meeting on May 4, 2000, that the Department of the Treasury is one of the two worst agencies in the Federal government with reference to EEO. Yet, neither the EEOC nor the Department of the Treasury itself seem to be taking any action to address this issue.

It is understood that the allegations, issues, and concerns presented in Ms. Carmona's *Current Statement of EEO Claims/Complaint* are not intended to be all-inclusive of decisions or events that are indicative of the continuing long-term pattern and practice of discrimination, retaliation, and hostile work environment directed towards Ms. Carmona by the Department of the Treasury. There may be others that may be uncovered during a proper investigation.

It should be noted that, whenever individuals are characterized in this document by minority status, gender, and/or age, it is purely for explanatory reasons, and is thought to be necessary as an aid in establishing the continuing long-term pattern and practice of discrimination, retaliation, and hostile work environment based on national origin, gender, and age as claimed in Ms. Carmona's formal EEO complaints. The characterizations are factual to the best of Ms. Carmona's knowledge, obtained from Department of the Treasury materials. Ms. Carmona requests that the EEO Investigator obtain the official EEO statistics for each individual named in Ms. Carmona's *Current Statement of EEO Claims/Complaint*, or subsequently identified during the investigation of this formal EEO complaint.

The continuing long-term pattern and practice of discrimination, retaliation, and hostile work environment directed against Ms. Carmona by the Department of the Treasury is, in part, demonstrated by the current EEO claims listed at the beginning of this document and discussed in more detail in the following pages. In addition, Ms. Carmona has provided documentation to corroborate her EEO claims in the Attachments, with the understanding that additional information will be obtained during a proper EEO investigation. This formal EEO complaint comprises a cover letter to Secretary of the Treasury Summers; Forms TDF 62-03.5, *Individual Complaint of Employment Discrimination with the Department of the Treasury*, TDF 62-03.1, *EEO Counseling Report - Individual Complaint*, and TDF 67-13.2, *Designation of Representative and Limited Power of Attorney*; a list of current EEO claims; a brief background; a discussion of current EEO claims; and Attachments A-W; for a total of 310 pages.

---

[1]        The *Weekly Highlights from the Inspector General*, which are sent via e-mail to all Office of Inspector General employees, contain a statement that these reports are intended for the use of Office of Inspector General staff. For this reason, copies have not been provided, although a reference is cited where the *Weekly Highlights* contain supporting documentation for Ms. Carmona's *Current Statement of EEO Claims/Complaint*. The majority of the information contained in the *Weekly Highlights* is also communicated to employees through other means, such as staff meetings. Ms. Carmona requests that the EEO Investigator contact the Office of Inspector General for copies of the *Weekly Highlights*.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

# DISCUSSION OF CURRENT EEO CLAIMS

## 1.   Assignment of Office Space and Furniture at the ABA Building in a Disparate Manner

The assignment of office space and furniture at the Office of Inspector General location at the American Bar Association (ABA) building at 740 15th Street, NW, provides prima facie evidence of the continuing long-term pattern and practice of discrimination, retaliation, and hostile work environment directed against Ms. Carmona by the Department of the Treasury. The reasons stated for the assignment made to Ms. Carmona and for subsequent moves made by other employees clearly demonstrate **pretext** on the part of senior management.

Senior management's disparate and discriminatory treatment of Ms. Carmona in not assigning her office space and furniture in keeping with the established criteria of seniority, as applied to others, has resulted in Ms. Carmona suffering an effective demotion in terms of prestige both within the organization and to external parties who have occasion to visit the ABA building for professional reasons. These disparate acts provide clear evidence of the Department of the Treasury's continuing long-term pattern and practice of discrimination, retaliation, and hostile work environment being committed against Ms. Carmona and provide clear evidence of the Department of the Treasury's continuous unworthy efforts to discredit Ms. Carmona in every manner possible with the end result being to ruin Ms. Carmona's career, her reputation, and her life.

These unconscionable acts provide further clear evidence of the Department of the Treasury's long-term pattern and practice of attempting to drive, through every means possible, individuals of Hispanic national origin out of the Department, while at the same time showing unmerited and privileged consideration to non-minority employees and members of other minority groups.

It has been mentioned to Ms. Carmona by Office of Inspector General staff that the Department of the Treasury is only interested in addressing class action suits, and not EEO issues raised by individuals. It is clear that the Department of the Treasury has not recruited, and is not recruiting, individuals of Hispanic national origin; has treated, and is treating, individuals of Hispanic national origin in a clearly disparate and demeaning manner; and has driven, and is driving, individuals of Hispanic national origin out of the Department. Ms. Carmona is concerned that these actions are a concerted effort, approved by Department of the Treasury senior management, to ensure that a class action suit cannot be filed by employees of Hispanic national origin.

It is Ms. Carmona's understanding that in 1994 African American employees, who today are overrepresented in the Office of Inspector General [Attachment C (C-5)], threatened a class action suit against the Department of the Treasury. This threat came at a time when Ms. Carmona was directed to stand and be led in prayer by a minister at a federally authorized function, and was directed to stand and sing the ***Black National Anthem*** at a federally authorized function. The results of these

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

two illegal acts was that two African American employees, those who organized and led these illegal activities, were promoted to management positions and Ms. Carmona was told by her SES manager, Gary Whittington, a Non-Minority White Male, that it was her responsibility to make African American employees *happy*.

This was also at a time when the Department of the Treasury started taking overt actions against Ms. Carmona, following Ms. Carmona bringing her concerns to Treasury management and the OSC, in order to ruin her career, her reputation, and her life. These overt actions being committed against Ms. Carmona continue today while certain non-minority employees and members of other minority groups are continuing to receive unmerited special consideration.

Regarding the instant assignment of office space, during the September 2000 move to the ABA building of all Office of Inspector General employees who were located at the West End Court (WEC) building at 1255 22nd Street, NW, Ms. Carmona was assigned space and furniture in a disparate and discriminatory manner not in keeping with the criteria established by management and applied to other employees.

When Ms. Carmona first saw the initial stage of the 'build out' of her assigned space at the ABA building on September 8, 2000, she immediately discussed the matter with her supervisor, Donald R. Kassel, a Grade 15 Non-Minority White Male who is the Director, *Banking and Fiscal Service*, requesting to be assigned office space in keeping with the established criteria, which was seniority. Mr. Kassel and Ms. Carmona went to look at the space. Mr. Kassel agreed that the office (604 on the floor plan) designated for Alexander Best, Jr., a Grade 14 African American Male who has less seniority than Ms. Carmona, was clearly a better office than the office designated for Ms. Carmona (603 on the floor plan). [Attachment D (D-5)]

Mr. Kassel agreed with Ms. Carmona that the assignment of office space is important. Mr. Kassel stated that he would discuss the matter with Marla Freedman, an SES-level Non-Minority White Female who is the Deputy Assistant Inspector General for Program Audit.

On September 12, 2000, Mr. Kassel mentioned that he had talked with Ms. Freedman, but did not know if she planned to make any change in office assignment in response to Ms. Carmona's request, even though a number of other revisions in the assignment of office space had been, and continued to be, made. On September 13, Ms. Carmona followed up in writing on her request to be assigned office space and furniture commensurate with her position in the Office of Inspector General in accordance with established criteria. [Attachment D (D-1)]

On Monday, September 25, Ms. Carmona contacted Ms. Sisselberger regarding the assignment of office space and furniture, in what Ms. Carmona perceived as Ms. Sisselberger's capacity as the Office of Inspector General EEO Officer, to initiate the EEO process. When Ms. Sisselberger advised that she no longer served in that capacity, Ms. Carmona contacted Ms. Baebel, an SES Non-Minority White Female

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

who is the Assistant Inspector General for Management Services, who stated that there was in fact no
Office of Inspector General EEO Officer.

Later that morning, at Ms. Carmona's request in the context of concerns about disparate treatment,
Ms. Baebel and Ms. Freedman came to Ms. Carmona's office to look at the space. Ms. Baebel stated
that the assignment of space was a management decision, and that Ms. Carmona should go ahead and
do what she needs to do. Ms. Freedman agreed that the office assigned to Mr. Best was clearly the
better office, and stated that she would consider the matter and discuss it with Dennis S. Schindel, an
SES-level Non-Minority White Male who is the Assistant Inspector General for Audit. It should be
noted that there was still time for management to easily take action to address the situation, because the
boxes and non-modular furniture of the affected staff had not yet been delivered.

It should also be noted that both Ms. Baebel and Mr. Schindel are principal alleged discriminating
officials in prior formal EEO complaints filed by Ms. Carmona; and that Ms. Baebel, Mr. Schindel,
Ms. Freedman, and Mr. Kassel are principal alleged discriminating officials in the instant matter.
As mentioned above, all four are Non-Minority White managers.

On Tuesday, September 26, 2000, at approximately 2:00 p.m., Ms. Carmona went to see Ms. Freedman
regarding the status of her request because she had not received a response based on the discussion the
prior day. At this point, there was still time for management to easily take action to address the
situation, because the boxes and non-modular furniture were just being delivered from WEC, and the
affected staff had not yet moved personal files and other effects into the offices.

Ms. Freedman told Ms. Carmona that she had discussed the matter with Mr. Schindel, and that the
decision was that Ms. Carmona would not be moved. Ms. Freedman stated that they were not making
any *wholesale changes* with reference to office space after the date that the telephone work order was
submitted. Ms. Freedman stated that she agreed that changing telephone numbers was not a big issue,
and that the date that the telephone work order was submitted was just the date that management
picked to not make any more changes in the assignment of office space.

Ms. Freedman stated that Inspector General Rush is planning to either move all of the staff at the ABA
building to another building in the immediate area or to do a complete redesign of the space in the
ABA building, so there were to be no other changes in the assignment of space until that time. The
time frame for implementing the Inspector General's plan was stated in general terms of within a few
months, with no specific date given.

It should be noted at this time that when Ms. Carmona and the other members of the *Office of
Oversight* were initially moved to WEC from the ABA building during August 1998, the staff was
promised that this would be a temporary move, not to exceed 6 months. Yet, Ms. Carmona and the
other staff members were at WEC for more than 2 years.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

It should also be noted here that during the 1998 move to WEC, senior management stated that it did not want to displace employees who were already at WEC. Thus, in 1998 Ms. Carmona was given office space and furniture not in keeping with her seniority. Grade 14 staff with less seniority than Ms. Carmona; including Alex Best, an African American Male; Jean Purcell, a Non-Minority White Female; and George Tabb, a Non-Minority White Male; all had better office space assigned to them.

In addition, the Office of Inspector General subsequently spent a significant sum of money to build two new private offices on the first floor of WEC, to better accommodate some of the senior staff who had been moved to the building, but no one was ever allowed to occupy the spaces. This resulted not only in a large waste of funds, but also in the continued disparate treatment of Ms. Carmona in terms of assignment of office space and furniture.

During the September 26, 2000, meeting, Ms. Freedman further stated that, actually, the only fair way to have assigned the space would have been to consider the seniority of all of the staff at the ABA building, including the CFO (Chief Financial Officer) staff who report to Bill Pugh, because some of them have better offices. Mr. Pugh, an SES-level Non-Minority White Male, is the Deputy Assistant Inspector General for Financial Statement Audit. Ms. Freedman also stated that she personally would have preferred to have the office that was assigned to Barry Savill, a Grade 15 Non-Minority White Male who reports to Ms. Freedman, but that *we can't all have our way.*

Ms. Carmona perceived the tone and content of this statement by Ms. Freedman as an attempt to belittle Ms. Carmona's concerns about not being assigned office space and furniture in keeping with the established criteria. In addition, Ms. Freedman's statement did not seem to fit with her position within the organization, because the office that Mr. Savill moved into had been occupied until September 2000 by Andrew J. Pasden, a Grade 15 Non-Minority White Male who was the Director, *Annual and Strategic Planning*, and Ms. Freedman could just as easily have moved into that office and given her own office to Mr. Savill. After all, Ms. Freedman was the SES official responsible for all of the employees who were moving to the ABA building from WEC, was Mr. Savill's first-line manager, and shared responsibility for the assignment of office space and furniture with Mr. Schindel.

Ms. Carmona reiterated to Ms. Freedman her statement from the prior day that she felt that office space and furniture had not been assigned in an equitable manner in keeping with the established criteria. Ms. Carmona further stated that she felt that the disparate manner in which the assignment of space had been handled was discriminatory.

Ms. Freedman stated that there was no intent to discriminate, but that Ms. Carmona should do whatever she felt she needed to do. Ms. Carmona asked why, if there was no intent to discriminate, management had not assigned her an office in keeping with her seniority, the established criteria. Ms. Carmona stated that all she was asking was to be treated with respect and in accordance with her grade level and length of service with the Office of Inspector General. There was no response from Ms. Freedman to Ms. Carmona's statement.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

This attitude of senior management toward Ms. Carmona's concerns was very similar to that displayed by Mr. Schindel when Ms. Carmona first raised EEO concerns during September 1995. Ms. Carmona had been **forcibly** reassigned to *Financial Statement Audit* in July 1995, and had been told by her Director, Antoine Elachkar, a Grade 15 Non-Minority White Male, immediately upon her arrival that she was not qualified to function at her grade level, and that she would have to function at a lower grade level and report to lower-level employees. Mr. Schindel, for whom Ms. Carmona had worked in the past, and who had given Ms. Carmona an Outstanding performance appraisal and a Special Act Award, gave Ms. Carmona the ultimatum of doing what Mr. Elachkar said or going through the formal personnel process. It was at that point that Ms. Carmona was forced to file her first EEO complaint in her 20-year Federal career.

Essentially, in the current case, Ms. Carmona was told separately, first by Ms. Baebel, and then by Ms. Freedman, that the assignment of office space was a management decision that was not going to be changed and that Ms. Carmona should do whatever she needs to do. Ms. Carmona, after considering this latest action in the context of the continuing long-term pattern and practice of discrimination, retaliation, and a hostile work environment, decided that she had no option but to continue to pursue the matter through the EEO process.

As Mr. Kassel agreed, the assignment of office space is important. This is true not only because it is the environment in which an employee spends most of her time, but also because of the perception that it creates among those who see the space. Office of Inspector General employees are aware of the criteria for assignment of space and of Ms. Carmona's seniority within the organization. Therefore, the assignment of less-desirable space sends a clear message as it demonstrates the disparate manner in which the Office of Inspector General continues to treat Ms. Carmona.

A number of Office of Inspector General employees have expressed concern to Ms. Carmona about the office space that she has been assigned, some stating that the manner in which Ms. Carmona has been treated *is not right* or *is not fair*. Clearly, the current assignment of office space and furniture is viewed by some as an attempt to humiliate Ms. Carmona and to treat her unfairly.

In addition, the layout of the assigned office is not very conducive to group meetings, which as an Audit Manager Ms. Carmona has on a regular basis. Ms. Carmona has no choice but to sit with her back to the door, which is not very professional, which makes it difficult to receive visitors from other organizations, and which less-senior Grade 14 staff and Grade 13 staff are not required to do. Ms. Carmona was given two work surfaces in an L-shape; less-senior Grade 14 staff were given three in a U-shape. Ms. Carmona has gray laminate modular furniture; many less-senior Grade 14 staff were assigned wood-grain furniture. Other disadvantages of the office include size, natural light, physical location (including in relation to senior management), noise level, and lack of finishing.

It should be noted that during earlier discussions regarding office space, Mr. Kassel suggested to Ms. Carmona that if senior management did not make a change, Ms. Carmona could go to Mr. Best about the matter personally, to see if he would agree to change offices. Mr. Kassel was thus suggesting

Page 12 of 60

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

an action that would clearly go against a management decision. Ms. Carmona responded that she considered this to be a management issue, and not something for Ms. Carmona to address with another employee. Clearly, Ms. Carmona has seniority and the matter should have been addressed by management, without Ms. Carmona ever having to raise the issue.

Ms. Carmona is also concerned about Mr. Kassel's suggestion because such an action would personally pit Ms. Carmona against an employee who is a member of another minority group. There have been a number of situations where Office of Inspector General managers seemingly have attempted to pit employees of different minority groups against each other, as discussed further under **Claim 20** of this EEO complaint.

Mr. Kassel also suggested that Ms. Carmona go directly to Mr. Schindel to request the change in office space if she was not pleased with the management decision communicated to her. Ms. Carmona responded that she was not planning to do this, because Mr. Kassel, in his role as her immediate supervisor, had already presented the matter to senior management. Also, it should be noted that Ms. Carmona was already aware of Mr. Schindel's discriminatory attitude towards her, as noted in her prior EEO complaints.

Prior to the September 8, 2000, discussion with Mr. Kassel, Ms. Carmona had spoken with both Mr. Kassel and with Mr. Tabb, the individual designated as the overall move coordinator, to express an interest in keeping the wood furniture that was in her office at WEC, including a large working table that she used for meetings with her staff. Ms. Carmona had held these conversations based on statements by management that employees should make their wishes known regarding furniture that was assigned to them at the time of the move.

Ms. Carmona was subsequently told by Mr. Kassel that he did not know if management would permit this. Then, on September 7, 2000, Ms. Carmona was notified in writing by Mr. Tabb that management would not, in fact, permit her to keep the working table. But Grade 14 employees with less seniority than Ms. Carmona were allowed to keep previously-assigned furniture. If Ms. Carmona had been treated in a similar manner and been allowed to keep the furniture that she had at WEC, the working table would have fit into her assigned office at the ABA building. Over the years, since 1995 when she first raised equal employment opportunity issues, Ms. Carmona has been forced to move and to give up her furniture, and has been assigned less-desirable office space. This is retaliation.

Yet, it should be noted that Mr. Kassel took a personal interest in the assignment of office space for other members of the staff. For example, Mr. Kassel was extremely concerned about a Grade 13 African American Female who had initially been assigned to share an office with another employee of the same grade. Mr. Kassel told Ms. Carmona that he was working hard behind the scenes to get this employee a private office, a change in the assignment of office space that did occur shortly before the move from WEC to the ABA building.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Mr. Kassel also told Ms. Carmona that the <u>executive wood furniture</u> in the private office that was assigned to this employee was not that great, that the pieces did not match (even though this furniture had been fine for the Grade 13 Non-Minority White Female who previously occupied the office). Mr. Kassel went out of his way to find matching executive wood furniture of a better quality, asking Mr. Schindel and Ms. Freedman for authorization to bring the furniture from a Grade 15 office on the fifth floor up to the sixth floor Grade 13 office prior to the move. Yet, nothing was done to ensure that Ms. Carmona had the appropriate office and furniture.

Although Ms. Freedman told Ms. Carmona that there were to be no wholesale changes in office assignments after the date that the telephone work order was submitted, Ms. Carmona found out that at least three employees had subsequently moved. Ms. Carmona sent an e-mail message to Ms. Freedman on November 8, 2000, asking why the decision applied to her did not apply equally to other members of the Office of Audit. Ms. Carmona cited the fact that these moves were allowed to occur as evidence that she was being treated in a disparate and discriminatory manner. [Attachment D (D-2)]

Ms. Freedman responded on the same day, stating, in part, that *in addition to seniority (which we've already discussed) there was also consideration given to keeping Directorates together on one floor*, thus introducing a criteria that had not been mentioned to Ms. Carmona before, and giving it priority, in the statement that follows. *So, ALL decisions/office assignments were made with that in mind -- (1) keeping Directorates together on one floor (primary), (2) seniority (secondarily)*. [Attachment D (D-3)]

Yet, it does not appear that senior management was keeping staff together on one floor. For example, Mr. Pasden, a Grade 15 Director who was on Mr. Schindel's immediate staff, was moved from the sixth floor of the ABA building, where all the rest of Mr. Schindel's immediate staff still work, to the fifth floor. Also, on November 15, 2000, Mr. Tabb, the overall coordinator for the move from WEC to the ABA building, made an unsolicited comment to Ms. Carmona (and others) that he was really upset that Mr. Schindel had gone back on his promise that when office space opened up on the fifth or sixth floor, we would again go down the list of seniority, and staff could move to better spaces, regardless of what floor it was on. Mr. Tabb was personally upset, because he felt that he should have had the opportunity to move from the office he currently occupies to better space.

Because of Mr. Tabb's central role in planning for the move, he would have had reason to know what commitments were made by Mr. Schindel. It is Ms. Carmona's understanding that Mr. Tabb attended the move-related meetings with senior management. These remarks by Mr. Tabb draw into question the statement about the previously unmentioned criteria, and serve as <u>**evidence of pretext**</u> on the part of senior management in its dealings with Ms. Carmona. It is clear that senior management makes up justifications for its actions against Ms. Carmona as it goes along.

In her response to Ms. Carmona, Ms. Freedman acknowledged that three Office of Audit employees did, in fact, move. This clearly goes against the stated policy that there would not be any wholesale

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

changes in office space. The reason given for the three moves, the retirement of Mr. Pasden, serves as further **evidence of pretext**. [Attachment D (D-3)]

It should also be noted that in her message, Ms. Freedman states that Iris Hudson's *office ended up being significantly smaller than what was provided to us by the contractors*. What Ms. Carmona recalls is that Ms. Hudson, a Grade 14 African American Female, was assigned to a first office that was determined to be larger than a second office which had initially been assigned to Jean Purcell, a Grade 14 Non-Minority White Female with seniority. Shortly before the move, when management decided not to spend a reported $10,000 to move a wall to make the size of the two offices more equitable, Ms. Hudson was reassigned to the second office, so that Ms. Purcell could have the larger office. About a month after the move to the ABA building had been completed, Ms. Hudson was then moved to a third, larger, and better office.

Senior management took action to ensure that a Grade 14 Non-Minority White Female was assigned office space and furniture in keeping with her seniority. Senior management took action to ensure that a Grade 13 African American Female was assigned executive wood furniture from a Grade 15 office. Senior management did not take action to ensure that Ms. Carmona, a Hispanic White Female, was assigned office space and furniture in keeping with her seniority. **This is prima facie evidence of disparate treatment**.

In addition to his being assigned office space and furniture in a disparate and preferential manner relative to Ms. Carmona, it is Ms. Carmona's perception that Mr. Best, an African American Male, has benefited from unmerited, disparate, and preferential treatment in work-related areas such as the granting of awards and the selection of Acting Directors.

Mr. Best was given a PCIE/ECIE Award for Excellence [*Weekly Highlights* - October 1, 1999] and an Office of Inspector General Special Act Award for an audit that he managed that clearly did not meet its stated objectives. In addition, during this audit, Mr. Best did not adhere to portions of the *Government Auditing Standards* and Office of Inspector General policy and practice.

It is Ms. Carmona's understanding that Inspector General Rush, an African American Male, was the Chairperson of the PCIE Audit Committee which administered the awards and was instrumental in obtaining the award for Mr. Best.

Ms. Carmona was assigned to serve as the Acting Director, *Finance and Debt*, during August 1999, at a time when the four reports for the PCIE/ECIE Non-Tax Delinquent Debt audit had already been issued for comment in draft form. Mr. Best reported directly to Ms. Freedman, the SES-level Non-Minority White Female who is the Deputy Assistant Inspector General for Program Audit, for this audit, rather than to the prior Acting Director, *Finance and Debt*, which in itself is evidence of preferential treatment. Ms. Freedman told Ms. Carmona that she need not get involved with the ongoing audit, although she was welcome to do so. Ms. Carmona responded that she wanted to be

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

involved with all of the *Finance and Debt* work while she was serving as the Acting Director, and subsequently reviewed the four draft PCIE/ECIE audit reports.

Ms. Carmona identified a number of concerns with the draft reports, and provided detailed comments during September and October 1999. In addition to the objectives not being met, concerns included the issuance of the draft reports to external parties before being indexed and referenced (a process of independent review) and the lack of supervisory review. For example, Mr. Best signed as both the Preparer and the Reviewer for a number of the working papers while Ms. Freedman was directly supervising Mr. Best. All of these points indicate a lack of adherence to professional standards and Office of Inspector General policy and practice. [Attachment E (all). See E-13 and E-14 for a summary.]

As a result of the failure to adhere to standards, external parties received a draft audit report that contained factual errors. Both Ms. Freedman, who was Mr. Best's immediate supervisor, and Mr. Schindel, the Assistant Inspector General for Audit, had approved the draft reports for issuance under the above-mentioned circumstances. In addition, a rush was placed on getting the draft report out for comment prior to Mr. Best receiving his PCIE/ECIE award, which was presented in a government-wide ceremony on September 29, 1999.

Even though Mr. Best himself admitted to Ms. Carmona that the objectives of the audit had not been met, and even though Ms. Freedman told Ms. Carmona that before she was named Acting Director a decision had been made to remain silent on the fact that the audit objectives had not been met, in the end Ms. Freedman dismissed Ms. Carmona's concerns, stating in an e-mail message, *I think Alex may have misspoken. I believe the objectives were met and our reporting on them is more of a matter of samantics (sic).* [Attachment E (E-15)]

During the last quarter of FY 2000, when the Inspector General made a decision to participate in a second PCIE/ECIE audit on the same matter, Mr. Kassel advised Ms. Carmona that she had been selected to serve as the Audit Manager. Mr. Kassel stated that, although it would have been logical to assign Mr. Best because of his prior experience, senior management *did not want to saddle* Mr. Best with the task again if he did not want it, so they gave Mr. Best the option, which he turned down.

Mr. Kassel agreed that the initial PCIE/ECIE audit did not meet the stated objectives. He concurred with Ms. Carmona that the objectives and related audit program (detailed audit steps) would have to be clearly defined to ensure that all of the participants could and would meet the stated objectives of the current audit.

Mr. Best was also treated in a preferential manner when he was selected for a temporary promotion to serve as the Acting Director, *Finance and Debt*, before other individuals who were senior to him in terms of experience and time as a Grade 14, including Ms. Carmona. Mr. Schindel made a point of personally announcing Mr. Best's selection during December 1998 in a very complimentary matter, a step he did not take for Ms. Carmona's selection. After Mr. Best served his *not to exceed 120 days*

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

period, Ms. Purcell, a Non-Minority White Female with less seniority than Ms. Carmona was selected to be the Acting Director. Ms. Carmona had to go to her Director at the time, Mr. Savill, and state that she would like to be considered for temporary promotion to this position before she was given the opportunity to serve as the third Acting Director, *Finance and Debt*.

Clearly, Mr. Best was treated in a preferential manner, and benefited financially as a result. These actions illustrate disparate treatment, and represent actual and potential financial loss for Ms. Carmona.

In summary, the decisions that were made by Mr. Schindel and Ms. Freedman with reference to the assignment of office space and furniture to Ms. Carmona in a disparate manner, not in keeping with the established criteria, constitute a prima facie case of discrimination, retaliation, and hostile work environment directed towards Ms. Carmona, in what is part of a continuous long-term pattern and practice by the Department of the Treasury. As illustrated above, the African American Male employee who most directly benefited from this decision had been the beneficiary of unmerited preferential treatment in earlier situations.

## 2.  <u>Manipulation of Personnel System in Violation of</u> <u>Merit System Principles</u>

There is a clear disregard for the Merit System Principles within the Department of the Treasury Office of Inspector General that has affected Ms. Carmona throughout her 16-year career with this organization. This disregard for the Merit System Principles is evidenced[2] by actions such as:
- Selection of individuals who do not meet even the basic qualifications for a position,
- Failure to address improprieties in a rating panel,
- Structuring a crediting plan to exclude internal candidates,
- Failure to address disparities between stated evaluation criteria and the corresponding crediting plan,
- Manipulation of best qualified lists,
- Blanket promotion of less-than-qualified individuals,
- Potential selection of a Grade 15 Director for political reasons, and
- Selectively applying specific experience as a criteria for qualification to senior positions.

---

[2]    Evidence of the manipulation of the Personnel system in violation of the Merit System Principles exists in the records of the Office of Inspector General Personnel Office and with the current and former employees of that Office and other organizational components. Ms. Carmona also has e-mail messages and other documents that provide evidence in support of her statements in this section. Because of the sensitive nature of Personnel issues, Ms. Carmona has not included the documents in her possession in this complaint.

Ms. Carmona requests that, in each instance, the EEO Investigator review, at the Office of Inspector General Personnel Office, the Vacancy Announcement, the Crediting Plan, the results of the Rating Panel, all of the documents that are listed in brackets after each subsection above, and any other relevant documents. Ms. Carmona also requests that Ms. Baebel, as the responsible Assistant Inspector General; Robert Hardos, as her Deputy; and other individuals with pertinent knowledge be interviewed regarding these illegal Personnel practices.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

It should be noted that the actions discussed in this section represent only some of the manipulation of the Personnel system undertaken by the Office of Inspector General. There have been other actions in the past. For example, the Office of Inspector General has structured positions at levels that normally would require competition as dual-grade positions, such as Grade 13/14 or Grade 14/15, as a way to promote Non-Minority White employees who might otherwise prove to not be as qualified as other candidates. It is Ms. Carmona's understanding that the Office of Inspector General may also use the technique of promotion through accretion of duties in a similar manner.

As stated in guidance provided during training, the merit system is a collection of methods used to implement the merit system principles, which are the framework for Federal Human Resources management and are the underpinnings of all Civil Service laws, rules, and regulations. It is a system on which all appointments and promotions in the Federal government are based. It is based on job-related competence rather than political favoritism.

Specifically, *(t)he purpose of the merit system is to hire people into the Federal government on the basis of their qualifications and to advance and retain them on the basis of their job performance - no other considerations may apply.*

The Merit System Principles at 5 USC 230l(b) include the following:

> *Recruit qualified individuals from all segments of society and select and advance employees on the basis of merit after fair and open competition.*

> *Protect employees from improper political influence.*

>> [See subsection below regarding the potentially political selection of a Non-Minority White Male under Age 40 for a senior position within the Office of Inspector General.]

The Prohibited Personnel Practices at 5 USC 2302(b) include the following:

> *Deceive or willfully obstruct a person's right to compete for employment.*

> *Give unauthorized preference or advantage to any person to improve or injure the employment prospects of any particular employee or applicant.*

>> [See the subsections below regarding the severe disadvantage suffered by Ms. Carmona because of prohibited personnel practices on the part of the Office of Inspector General.]

Yet, the Office of Inspector General continues to manipulate the Personnel System in violation of the Merit System Principles, in part by taking actions such as those discussed below.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

It is Ms. Carmona's understanding that the last two heads of the Personnel function, Trina Petty and Catherine (Kitty) McCoy, who reported to Ms. Baebel, may have left at least in part due to serious concerns about the manner in which the Office of Inspector General Personnel Office was being forced to operate. It is Ms. Carmona's understanding that Jane Fox, a prior head of Personnel, may also have left the Office of Inspector General because of concerns that she had about these matters.

## Selection of Individuals Who Did Not Meet the Basic Qualifications

During 1999, the Office of Inspector General Boston Regional Office made a decision to hire two individuals who did not meet the basic qualifications to function as auditors, i.e., they did not have the required education or experience. Specifically, the selected individuals did not have 24 semester hours in accounting.

It was announced at a staff meeting that the Inspector General himself discovered that the selected individuals did not meet the basic requirements when he reviewed the applications.

Ms. Carmona is concerned as to how individuals who do not meet even the most basic requirements for a position are able to make the best qualified list and be selected for a vacancy. Whatever the motivation for selecting such individuals, it certainly is not in keeping with the Merit System Principles.

[Documents: Applications of non-qualified individuals who were selected.]

## Failure to Address Improprieties in a Rating Panel

During May 2000, Ms. Carmona expressed concerns about the integrity of the process undertaken by an Office of Inspector General Rating Panel based on the failure of at least one member of the Panel to follow directions. The Panel was for a position in Chicago for a Supervisory Auditor, GS-511-l4, under Vacancy Announcement OIG-00-013.

Specifically, a member of the Panel stated that even though the applications did not indicate the required level of supervisory responsibility, he had given Department of the Treasury Office of Inspector General applicants the *benefit of the doubt*. This member of the Panel also stated that he relied on knowledge that he personally had about the work performed by Office of Inspector General applicants, including the level of complexity of audits on which they worked, to arrive at a rating, even though this information was not reflected in the material submitted by the applicants.

Ms. Carmona raised these concerns to Kim Mingo, an African American Female who was the Personnel representative responsible for administering the Rating Panel, during Panel discussions. It should be noted that during these discussions it became very clear that the member of the Panel mentioned above, who is an African American Male, applied his *benefit of the doubt* approach to African American candidates.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Ms. Mingo checked the ratings given by the three members and found that there were significant variances. Ms. Mingo subsequently stated that she discussed these matters with her first- and second-level supervisors, whom Ms. Carmona understood to be Ms. McCoy, a Grade 14 Non-Minority White Female, and Mr. Hardos, a Grade 15 Non-Minority White Male who is the Deputy Assistant Inspector General for Management Services. Yet, Ms. Mingo advised Ms. Carmona of the decision that the ratings resulting from these actions *were appropriate and in full compliance with the merit system principles and applicable guidelines on rating applicants*.

How could actions of a member of the Rating Panel that granted special consideration to selected internal candidates and specifically disadvantaged external candidates in such a manner be deemed appropriate and in compliance with Merit System Principles?

[Documents:  E-Mail Messages to Ms. Mingo from Ms. Carmona, May 18 and May 24, 2000]
[                E-Mail Message to Ms. Carmona from Ms. Mingo, June 22, 2000]

**Structuring a Crediting Plan to Exclude Internal Candidates**

The crediting plan for a position in Chicago for a Supervisory Auditor, GS-511-l4, under Vacancy Announcement OIG-00-013, was structured in such a manner as to exclude a number of Department of the Treasury Office of Inspector General applicants from Washington, DC. Because of the manner in which the criteria was defined, these applicants, who had been performing their assigned tasks in an excellent manner, were not able to qualify for the *Superior* rating (30 points) in the first two statements of Knowledge, Skills, and Abilities. The crediting plan imposed a *regular and recurring* supervisory requirement that most, if not all, of the Office of Inspector General Grade 13 candidates from Washington, DC, had not been given the opportunity to display. Thus, the structuring of the crediting plan had the effect of excluding otherwise well-qualified Office of Inspector General candidates from the best qualified list.

The fact that Ms. Freedman and Roberta Rickey, the Grade 15 Non-Minority White Female Regional Inspector General, interviewed and selected two external candidates who worked for the Environmental Protection Agency, reportedly the agency for which Ms. Rickey's husband works, has caused further concern among the Washington, DC, staff who did not make the best qualified list, a number of whom are minority employees.

[Documents:  E-Mail Messages to Ms. Mingo from Ms. Carmona, May 18 and May 24, 2000]

**Failure to Address Disparities Between Stated Evaluation Criteria and Crediting Plan**

On November 3, 2000, an Office of Inspector General Rating Panel expressed concerns with the manner in which the crediting plan was structured for the Office of Audit positions of Auditor, GS-5ll-l3, in nine locations under Vacancy Announcement OIG-00-018. Specifically, the Panel believes that the crediting

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

plan imposes requirements that an applicant could not have known to address based on the language contained in the **EVALUATION CRITERIA** section of the Vacancy Announcement.

The Rating Panel felt that applying the crediting plan as written would result in the exclusion of some highly-qualified applicants who provided applications and/or statements of Knowledge, Skills, and Abilities (KSAs) that were responsive to the stated evaluation criteria, but not to the crediting plan. Thus, the objective of identifying the best qualified applicants for the positions in keeping with the Merit System Principles would not be met. The Panel believes that the applicants for these positions responded in good faith to the Office of Inspector General vacancy announcement, and should be given fair consideration based on the KSAs to which they were asked to respond.

It should be noted that at a time when members of this panel were still reviewing the applications, Ms. Baebel reported to Inspector General Rush that all of the rating panels had completed their work. While the panel members have now completed their review and rating of the applications, Ms. Mingo has not yet asked them to reconvene to discuss any variances in the ratings. In addition, the Rating Panel still has significant concerns that as of December 15, 2000, had not been addressed. Clearly, this Rating Panel has not been completed.

> [Documents: E-Mail Message to Ms. Mingo from Ms. Carmona; cc: Mr. Schindel, Ms. Baebel, Other Two Members of Rating Panel; Dated November 3, 2000]

**Manipulation of Best Qualified Lists**

It has been a practice of the Office of Inspector General to take whatever action is necessary to ensure that the candidates that managers want to select are placed on best qualified lists even if they are not well-qualified, and that other better-qualified candidates are excluded, regardless of how that is achieved.

This is one reason why Office of Inspector General best qualified lists vary so much in terms of the numbers of candidates included. This specifically concerns Ms. Carmona because it is her understanding that the best qualified list for the SES position of Deputy Assistant Inspector General for Program Audit, for which she applied, consisted of only three names. Reference EEO complaint TD-99-1119, filed by Ms. Carmona on February 5, 1999, to address this matter. Yet, other Office of Inspector General best qualified lists include well over ten names.

Manipulation of best qualified lists gives unauthorized preference or advantage to an individual to improve or injure the employment prospects of another, and is thus a prohibited personnel practice.

One example of possible manipulation of a best qualified list may have occurred in the selection for staff for promotion to a Grade 14 position in *Financial Statement Audit*. Ms. Carmona was told that Mr. Elachkar, the Grade 15 Non-Minority White Male Director who was the Selecting Official, was *incensed* to find that Shonya Thomas, a Grade 13 African American Female, was not on the best

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

qualified list. Ms. Carmona was told that Mr. Elachkar went to Personnel and *threw a fit*, demanding that Ms. Thomas be placed on the list.

As head of Personnel, Ms. McCoy reportedly was one of the officials who dealt with this matter. Apparently over her objections, the best qualified list was changed, and Ms. Thomas was selected for promotion to the Grade 14 over other better-qualified individuals. Because Mr. Elachkar had brought Ms. Thomas to the Department of the Treasury, this manipulation of the best qualified list was viewed by many as an act of cronyism. In fact, Ms. Carmona was told that, within 2 months, four Grade 13 employees in *Financial Statement Audit* resigned from the Office of Inspector General because of this selection, and two others requested and obtained a transfer out of *Financial Statement Audit*.

Similarly, Chris Heppe, a Grade 14 Non-Minority White Male Deputy Director, was not pleased with the best qualified list that he received for a Grade 13 Statistician vacancy in the *Office of Evaluations*. He contacted Ms. Mingo, requested to review the paperwork for all of the applicants, and then insisted that one of the omitted applicants be placed on the best qualified list.

Ms. Carmona requests that the EEO Investigator interview Ms. Petty, Ms. McCoy, and Ms. Mingo for information regarding the instances cited above, and for further information regarding the practice of manipulation of best qualified lists within the Office of Inspector General.

**Blanket Promotion of Less-Than-Qualified Individuals**

The Office of Audit processed a Blanket Promotion to the Grade 13 for every GS-511-12 auditor who had been in grade for a year or longer, effective in mid-2000. These promotions were not in keeping with the Merit System Principles in that there was no competition for the positions, supervisory certification was not provided, and required documents, such as a Position Description and Performance Elements and Standards, were not prepared. Some of the auditors who were previously required to compete for the Grade 13, and at least one Grade 12 employee in another series, have raised the issue of disparate treatment.

Ms. Carmona was required to compete for the Grade 13 and then again for the Grade 14 during her career. She has been a manager of Grade 13 staff members who were required to compete for that grade level. Her position within the organizational hierarchy has therefore been diminished by the Blanket Promotion.

It is Ms. Carmona's understanding that the Blanket Promotion was processed at the personal direction of Inspector General Rush. Included in the group of Grade 12 auditors who benefited were a number of employees who were considered by their supervisors to be less-than-qualified to function at the Grade 12 level, much less to advance to the Grade 13.

In the past, Grade 13 positions within the Office of Audit required that the position be announced and competed. Historically, Grade 13 auditors have served in a *lead-auditor* or *auditor-in-charge*

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

capacity, and have been responsible for reviewing the work of subordinate staff. Grade 13 auditors
have been expected to function independently, with a minimum amount of guidance or day-to-day
supervision.

Supervisors were not requested to provide input on the individuals selected for the Blanket Promotion.
Yet, for career-ladder promotions to each grade in the normal auditor progression (7/9/11/12),
supervisors are required to certify that an employee is performing well at the current level and has the
knowledge, skills, and abilities to function at the level to which he or she will be promoted. Even
within-grade increases require supervisory certification of satisfactory performance.

Ms. Carmona was told that a number of the Directors *vehemently opposed* the Blanket Promotion,
and that some of the Directors personally contacted the Inspector General to request that this action
not be taken. Reportedly, Inspector General Rush replied that unless a Grade 12 who had been
in grade for a year or more was on a Performance Improvement Plan (PIP), he or she was to be
promoted immediately.

This determination by Inspector General Rush is a complete contradiction to the policy that he
communicated in an April 5, 2000, memorandum for Office of Audit employees titled *Career Ladder
for Auditors*. This memorandum, included as Attachment G, stated, the following, in part (emphasis as
reflected in the document).

> I have decided to raise the career ladder for Auditors to GS-13. ... The new career ladder
> will go into effect at the beginning of the next performance appraisal rating cycle on
> June 1, 2000. ... Promotions to GS-13 will <u>not</u> be automatic. To be eligible an employee
> must 1) meet the qualification and time-in-grade requirements (one year at the GS-12 level)
> *and* 2) have demonstrated to management that the employee has the necessary knowledge
> and ability to perform GS-13 level work successfully. An employee may be promoted at any
> time that management determines both of these requirements are met. [G-9]

Ms. Carmona was also told that a GS-343-12 African American Female Management Analyst who had
the same Performance Elements and Standards as the Grade 12 Auditors, but who was not included in
the Blanket Promotion, has raised the issue of disparate treatment to Inspector General Rush. It is
Ms. Carmona's understanding that, after asking why she was being treated in a disparate manner, this
Management Analyst was told that before she could be promoted to the Grade 13 she would have to
undergo a desk audit, which was not required of the Grade 12 auditors with whom she had worked
side-by-side.

This Management Analyst has since been detailed to the *Office of Evaluations*. Ms. Carmona has been
told that this employee may be accommodated with a promotion to the Grade 13, following a *quick
turn-around, limited area of consideration* vacancy announcement. Such a promotion, if it occurs,
would appear to be preselection, and thus a further violation of the Merit System Principles.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

It is Ms. Carmona's understanding that the Blanket Promotion was processed without preparing a corresponding Position Description. The last Ms. Carmona heard, Personnel staff were trying to develop an appropriate Position Description and corresponding Performance Elements and Standards, because it was felt that some of the promoted staff could not be expected to function in the same manner as the auditors who had earlier competed for Grade 13 positions. There were discussions about the fact that if a revised Position Description was not developed, Office of Audit managers would be required to place the promoted auditors in lead roles, and then take supervisory action, including the use of Performance Improvement Plans, if these individuals fail at the assigned *lead-auditor* tasks. In the meantime, managers were verbally instructed to give each of the promoted employees the current Grade 13 Auditor Performance Elements and Standards.

Some of the auditors who previously had to compete for the Grade 13 have expressed serious concerns about the fact that the Blanket Promotion was processed. They have raised the issue of disparate treatment and have questioned whether they will continue to have a greater level of responsibility as *lead auditors* over their recently-promoted Grade 13 counterparts, without receiving any additional compensation.

Ms. Carmona is concerned that her career and her reputation could be placed in jeopardy by being required to supervise one or more of the individuals subject to the Blanket Promotion.

Ms. Carmona requests that the EEO Investigator obtain the name, effective date, and EEO Statistics for each employee who benefited from the Blanket Promotion.

**Potential Selection of Grade 15 Director for Political Reasons**

The recent selection of Adam Silverman for a Grade 15 position as Director, *Office of Evaluations*, was potentially based on political reasons rather than consideration of job performance or knowledge, skills, and abilities, as required by the Merit System Principles. As stated above, the Merit System Principles also require that agencies *protect employees from improper political influence*, which the Department of the Treasury has apparently not done in this case.

Mr. Silverman, a Non-Minority White Male under Age 40, worked as an Executive Officer on the staff of the current Commissioner of the U.S. Customs Service, Raymond W. Kelly. It is Ms. Carmona's understanding that Mr. Silverman had also worked closely with the former Chief Financial Officer of Customs, Vincette Goerl, who reportedly had close political and personal ties to former Treasury Inspector General Valerie Lau. It should also be noted that Ms. Freedman was the Office of Inspector General Director responsible for the Customs financial statement audit.

It has been stated that Mr. Silverman was extremely concerned that he would lose his job following the Presidential election, under a new Administration, and applied for the *Office of Evaluations* position for this reason, even though he has no experience in the field of evaluation or in the Office of Inspector General. Comments have also been made that Inspector General Rush exerted pressure on

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Mr. Schindel, the selecting official, to choose Mr. Silverman over better-qualified individuals. See **Claim 3** for a further discussion regarding the selection of Mr. Silverman.

Inspector General Rush just announced that he plans to close the office in New Orleans in the near future [*Weekly Highlights* - December 6, 2000]. Ms. Carmona was told that the two remaining staff members in that office do not want to relocate, and that Inspector General Rush offered to do whatever he could to find them other Federal jobs in that city. It is Ms. Carmona's understanding that Customs is the only Treasury Bureau with sizable representation in New Orleans. It is possible that, in exchange for the selection of Mr. Silverman to a career position with the Office of Inspector General, the two Office of Inspector General staff members in New Orleans will be given positions with Customs.

Why does the Office of Inspector General not select its own internal career Federal employees who are qualified to be promoted into senior positions? What has senior management done to develop internal candidates? Why were auditors with extensive experience with the Office of Inspector General not considered over an external candidate? Why was the Grade 14 employee who had been serving as Deputy Director of the *Office of Evaluations* for 5 years not better qualified than an external candidate who had no experience in evaluation or, apparently, in managing staff or an office?

It should be noted that Ms. Carmona had requested to be considered for the position of Deputy Director of the *Office of Evaluations* when the office was first established in 1995. There is documentation on the record in EEO Complaint TD-96-1069, filed on December 14, 1995, that indicates that senior management explained Ms. Carmona's non-selection by stating that there was no need for a GS-14 in Ms. Baebel's office, that she needed lower level staff. However, Ms. Baebel <u>did</u> select a GS-14 Deputy Director, Mr. Heppe, a Non-Minority White Male.

**Selectively Applying Experience as Criteria for Qualification**

The Office of Inspector General has selectively required experience as a criteria for qualification for a position, to the direct disadvantage of Ms. Carmona and to the direct advantage of Non-Minority White employees. Senior managers have at times claimed that specific experience is required for a position, only to completely ignore that requirement when they want to place an individual without that experience into the position.

For example, when Ms. Carmona was forcibly reassigned to *Financial Statement Audit* in July 1995, she suffered an effective demotion, both in terms of responsibility and in terms of prestige within the organization. Ms. Carmona, who was a Grade 14 Supervisory Auditor at the time, was told by Mr. Schindel that her only option to functioning at a lower grade level, reporting to lower-level employees, was to go through the formal personnel process. Yet, at that time, Non-Minority White employees, including Danny Athanasaw (Grade 15) and Wayne Goleski (Grade 14), were allowed to function at their grade levels in *Financial Statement Audit* without having prior financial statement audit experience and without first having to (1) function at lower grade levels or (2) report to

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

lower-level employees. These matters are addressed in a previous formal EEO complaint filed by Ms. Carmona.

Prior to this forced reassignment of Ms. Carmona in 1995, Deputy Inspector General Richard Calahan, an SES-level Non-Minority White Male, had brought Ms. Baebel, a Non-Minority White Female, into the Office of Inspector General, then established a new *Office* and, without announcing the position, made Ms. Baebel its Grade 15 Director.

Mr. Calahan has stated that the position of Director of the Office of Evaluation and Inspections was not filled competitively but rather by transferring a current grade 15 professional evaluator, Emilie Baebel from the Department of Health and Human Services (HHS). Mr. Calahan has further stated that he had become quite familiar with Ms. Baebel's work as a professional evaluator in the Office of Inspector General at HHS, that the OIG had an immediate need for a top flight evaluator, and that Emilie Baebel was precisely what the Treasury Department needed.

Yet, even though Deputy Inspector General Calahan stated a precise need for Ms. Baebel, i.e., as a top flight evaluator, it was announced in 1998 that Ms. Baebel had been detailed to act as the Assistant Inspector General for Management Services. Ms. Baebel was subsequently promoted into the SES in this position, even though her experience was apparently in Evaluations and not in Personnel, Human Resources, Budget, or the other functions that reported to this position. Ms. Baebel was also named the Chief Financial Officer for the Office of Inspector General, another area in which she apparently lacked experience. To Ms. Carmona's knowledge, Ms. Baebel is not a Certified Public Accountant (CPA), a qualification that prior managers in this position and Chief Financial Officers have had.

When Mr. Calahan brought Ms. Baebel into the Office of Inspector General, there were rumors that he had promised to promote her to the SES. It should also be noted that ever since the position of Assistant Inspector General for Management Services was first established, it had been held by career Auditors, not Evaluators. The position was held first by Gary Whittington, then by John Balakos, both of whom were Non-Minority White Males who were career Auditors and CPAs, and both of whom had experience at the SES-level prior to being selected for the position. Ms. Carmona is concerned that Ms. Baebel's selection to the SES is another clear example of preferential treatment of Non-Minority White employees and cronyism within the Office of Inspector General.

Then, in a complete reversal of Mr. Calahan's stated justification for hiring Ms. Baebel, i.e., the immediate need for a top flight professional evaluator, which resulted in the creation of a new office and Ms. Baebel's non-competitive selection for the position of its Grade 15 Director, the Director, *Office of Evaluations* (title shortened), was subsequently held by two GS-511-15 Non-Minority White Male Supervisory Auditors, first Kenneth Clarke until December 1999, and then Andrew Pasden.

And then, in yet another reversal, the position was most recently restructured as a GS-343 Program Analysis Officer, and Mr. Silverman, a Grade 15 Non-Minority White Male without any apparent evaluation or audit experience, was selected.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

The situation with the Director, *Office of Evaluations*, clearly illustrates how senior management has selectively required experience as a criteria for qualification for a position as a means of selecting Non-Minority White employees on a basis other than *merit after fair and open competition*, as required by the Merit System Principles.

More recently, a number of Non-Minority White employees have been moved from *Financial Statement Audit* to *Program Audit* without any loss in responsibility or reporting level. In sharp contrast to what happened when Ms. Carmona was forcibly reassigned into *Financial Statement Audit* during 1995, in fact, these employees have been given either higher-level positions, as in Ms. Freedman's case, or increased responsibility, as in Robert Taylor's and Katherine Leone's cases.

Ms. Freedman, a Non-Minority White Female, was promoted to the SES position of Deputy Assistant Inspector General for Program Audit, even though her experience with the Treasury Office of Inspector General had all been in *Financial Statement Audit*. To Ms. Carmona's knowledge, Ms. Freedman's prior experience, at the General Services Administration, was also in financial auditing.

Mr. Taylor, a Non-Minority White Male, was placed in a senior position, reportedly as Special Assistant to Ms. Freedman, the Deputy Assistant Inspector General for Program Audit, even though his recent experience with the Treasury Office of Inspector General had been in *Financial Statement Audit*. Mr. Taylor was placed in the position of reviewing and revising reports issued by *Program Audit*, and of meeting with Congressional Committees regarding the Annual Plan for the Office of Audit.

Similarly, Ms. Leone, a Non-Minority White Female, was reportedly assigned to Ms. Freedman. Ms. Leone has since been given various assignments, including the lead on a Quality Assurance Review of *Program Audit*, even though her experience with the Treasury Office of Inspector General had all been in *Financial Statement Audit*. More recently, Ms. Leone was given a senior position on the Treasury Peer Review of another Federal agency.

Yet, when Ms. Carmona, a Hispanic White Female, was **forcibly** reassigned to *Financial Statement Audit* in July 1995, she was told that she was not qualified to function at her grade level, and that she would have to function at a lower grade level and report to lower-level employees.

In all three cases discussed above, individuals with *Financial Statement Audit* experience were placed in positions of significant responsibility in *Program Audit*. Ms. Carmona is concerned that these placements will lead to additional Personnel actions that will further block Ms. Carmona's opportunity for promotion, as specifically explained under **Claim 19**.

---

In conclusion, the clear disregard for the Merit System Principles by the Office of Inspector General has affected Ms. Carmona over the years, resulting in a loss of opportunities and promotions, placing Ms. Carmona at a professional and financial disadvantage.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

For example, as mentioned above, Ms. Carmona believes that the best qualified list for the position of Deputy Assistant Inspector General for Program Audit was manipulated to exclude her. On February 5, 1999, to address this matter, Ms. Carmona filed formal EEO complaint TD-99-1119, which the Department of the Treasury has refused to process. Please note that Ms. Carmona was the most highly qualified candidate for this SES position. In fact, an independent panel, including a PCIE/ECIE member, had placed Ms. Carmona on the best qualified list for an **Inspector General position** at another agency during 1993, six years prior.

Ms. Carmona is very concerned that she will continue to be affected by practices such as those described above, in manipulation of the Personnel system and total disregard for the Merit System Principles. For example, Ms. Carmona questions how many crediting plans have been, or will be, structured to specifically exclude her from a best qualified list. And how many times has a best qualified list been altered so that Ms. Carmona does not appear on it? Will this happen in the future, as senior-level vacancies become available?

As a Hispanic White Female over Age 40, Ms. Carmona has suffered from a long-term pattern and practice of discrimination, retaliation, and a hostile work environment directed against her by the Department of the Treasury. For these reasons, Ms. Carmona requests that every Personnel action that has affected her, or may have affected her, be investigated.

## 3.    Failure to Provide Opportunity for Promotion

Ms. Carmona's opportunity for promotion, and thus her pay and benefits, have been affected by the selection of a Non-Minority White Female under Age 40 without *Program Audit* experience to an SES *Program Audit* position, by the cancellation of a Grade 15 *Program Audit* vacancy after the completion of the qualification and interview processes, and by the structuring of an *Office of Audit* Grade 15 vacancy as a non-auditor position, with the subsequent selection of a Non-Minority White Male under Age 40.

It is Ms. Carmona's understanding that in each case the decision was made by Mr. Schindel, an SES-level Non-Minority White Male who is a principal alleged discriminating official in the instant matter and in each of the other eleven formal EEO complaints that Ms. Carmona has been forced to file since December 1995.

Ms. Carmona is also concerned about actions that senior management is taking now to limit her future opportunities for promotion in upcoming vacancies. The fact that the Department of the Treasury has failed to address Ms. Carmona's concerns as she has raised them over the years is placing Ms. Carmona at a serious disadvantage for future positions, for at least two reasons. First, as Ms. Carmona has applied for positions and not been selected, Office of Inspector General senior management has taken action to give non-minority employees and members of other minority groups experience similar to that which Ms. Carmona has had in the past, so that these employees can be placed on the best qualified list

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

and selected.  Second, Office of Inspector General senior management is not giving Ms. Carmona any significant assignments or management training so that she may enhance her own experience.  Thus, Ms. Carmona is very concerned about her uncertain future within the Department of the Treasury.

Regarding the non-selection to the SES *Program Audit* position, please refer to formal EEO complaint TD-99-1119, which was filed on February 5, 1999, and which the Department of the Treasury has refused to process.  Please note that Ms. Carmona made her initial contact for assignment of an EEO Counselor on November 17, 1998, and, due to the non-assignment of an EEO Counselor for over 2 months, Ms. Carmona felt compelled to file a formal EEO complaint, as in the instant matter. Please note that Ms. Carmona was the most highly qualified candidate for this SES position.  In fact, an independent panel, including a PCIE/ECIE member, had placed Ms. Carmona on the best qualified list for an **Inspector General position** at another agency during 1993, six years prior.

**Selection of Individual Without Program Audit Experience to an SES Program Audit Position**

On September 8, 1998, Ms. Carmona applied under Announcement Number OIG-98-022 for the position of Deputy Assistant Inspector General for Program Audit, ES-511.  [Attachment F]

Ms. Carmona did not receive official notification as to whether she made the best-qualified list; however, she was not interviewed for the position.

On October 21, 1998, Mr. Schindel sent a memorandum announcing that Ms. Freedman had been selected.  The announcement indicated that Ms. Freedman had joined the Department of the Treasury Office of Inspector General in 1994 (Ms. Carmona joined in 1983) and had *Financial Statement Audit* experience, but did not reflect any *Program Audit* experience.  [Attachment G (G-1)]

It is Ms. Carmona's understanding that prior to joining Treasury Ms. Freedman had worked in financial, not program, auditing.  Ms. Freedman had less Federal service than Ms. Carmona, and also less years of service within the Department of the Treasury, its Bureaus, and its Office of Inspector General. In fact, Ms. Freedman had dealt with only one Treasury Bureau, in one discipline, CFO.  It is also Ms. Carmona's understanding that Ms. Freedman is a Non-Minority White Female who at the time of the selection was under Age 40.

It is Ms. Carmona's understanding that Mr. Schindel has stated to others that he selected Ms. Freedman to fulfill EEO needs.

It should also be noted that it was *Management Services*, the organization that Ms. Baebel was made the head of at this point, that excluded Ms. Carmona from the best qualified list for this SES position. Ms. Baebel, a Non-Minority White Female who is the Assistant Inspector General for Management Services, was brought in to the Department of the Treasury by Deputy Inspector General Calahan, and is, along with Mr. Calahan, a principal alleged discriminating official in Ms. Carmona's formal EEO complaints.

How is it that Ms. Carmona can make the best qualified list and be interviewed for a position of Inspector General at another agency in 1993, but does not receive consideration for a Deputy Assistant Inspector General position within her own organization?

**Cancellation of Grade 15 Program Audit Vacancy**

On June 25, 1999, Ms. Carmona applied under Announcement Number OIG-99-019 for the position of Supervisory Auditor, GS-511-15. [Attachment H]

Ms. Carmona made the best qualified list, and successfully completed the first and second interviews. The second interview, which was on September 22, 1999, was with Mr. Schindel and Ms. Freedman. Ms. Carmona was advised during that interview that the application packages would be provided to Inspector General Rush, with a recommendation for the selection.

Because Mr. Schindel and Ms. Freedman expressed a specific interest during the interview, on September 23, 1999, Ms. Carmona delivered three copies of the report from the Recruitment Task Force that Ms. Carmona headed up in 1989 at the request of Jay Weinstein, the Assistant Inspector General (AIG) for Audit at the time; one copy for Mr. Schindel, one for Ms. Freedman, and one for inclusion with the application package to be sent to Mr. Rush. [Attachment I]

Then, suddenly, a decision was made to cancel the position.

This decision concerns Ms. Carmona, not only because it closed an avenue for promotion, but also because there was every indication that the position was going to be filled.

First, the position of Director, *Finance and Debt,* which this vacancy announcement was intended to fill, had been kept intact, under the leadership of three successive Acting Directors. Ms. Carmona was the third Acting Director, and served in this capacity from August 29, 1999, through March 11, 2000, including a temporary promotion to the GM-511-15 for the period August 29 through December 25, 1999. See Attachment J for a Statement of Accomplishments during Ms. Carmona's tenure as Acting Director and for the Notifications of Personnel Action (SF-50s) for the temporary promotion and for a Special Act Award for work performed during this period.

Second, Inspector General Rush had indicated a need to increase the number of Grade 14 and 15 staff in the Office of Audit, approving an increase to 26 from 24 in early December 1999. The Inspector General also stressed the need to fill positions quickly because of the very high number of vacancies. [*Weekly Highlights* - December 8, 1999]

Third, the Office of Inspector General had gone through each step of the hiring process, including a second round of interviews for some of the candidates with the Selecting Official and her manager.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Instead, a reorganization was announced on January 19, 2000, the result of which was that the position of Director, *Finance and Debt,* was no longer in existence. The functions of the office were merged into an office that is now called *Banking and Fiscal Service*, under the direction of Mr. Kassel, a Grade 15 Non-Minority White Male who had been the Special Assistant to Mr. Schindel. [Attachment K]

It should be noted that it took only about 6 weeks from the closing of the vacancy announcement to process the applications and announce the selection of Ms. Freedman, a Non-Minority White Female, for the SES position of Deputy Assistant Inspector General for Program Audit. In contrast, it took more than 6 months before a definitive announcement, i.e., a reorganization, was made with reference to the Grade 15 Director vacancy position for which Ms. Carmona, a Hispanic White Female, made the best qualified list and was interviewed twice.

A reason given for canceling the position was that too many Grade 15s already existed in the Office of Audit, and it was stated that the decision to cancel the position was made by Inspector General Rush. When did Inspector General Rush determine that too many Grade 15s existed? Why was the decision made only after Ms. Carmona made the best qualified list, had successfully completed the two rounds of interviews, and was the best qualified individual for the job? Why have other Grade 15 positions been filled in the Office of Audit since this cancellation?

**Structuring of an Office of Audit Grade 15 Vacancy as a Non-Auditor Position**

A vacancy for a Grade 15 position that had been held by GS-511 Supervisory Auditors was structured as a GS-343 Program Analysis Officer to, in Ms. Carmona's opinion, limit the opportunity of qualified candidates such as Ms. Carmona for promotion. [Attachment L]

It was also stated openly at meetings that Inspector General Rush did not want an auditor in this position within the Office of Audit.

Mr. Schindel selected Adam Silverman, a Non-Minority White Male under Age 40, for this position, which was for the Director, *Office of Evaluations*. [Attachment L (L-5)]

It is Ms. Carmona's understanding that Inspector General Rush exerted influence over Mr. Schindel to select Mr. Silverman. See **Claim 2** for additional discussion.

It is Ms. Carmona's understanding that Mr. Silverman has no experience in the field of Evaluations or in the Office of Inspector General. In fact, Mr. Silverman reportedly was not even aware of the professional standards that apply to evaluations, i.e., the PCIE *Quality Standards for Inspections*, until after he joined the Office of Inspector General. There is no indication that Mr. Silverman was head of an office or had managerial responsibility for employees.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Also, even though it appeared that management was phasing out the *Office of Evaluations*, having reduced it to only two employees, now that Mr. Silverman has been placed as its Director, there is talk of significantly increasing the size of the office. Ms. Carmona understands that some external candidates have recently been offered positions within the *Office of Evaluations*. Yet, as discussed below, Ms. Carmona has had difficulty getting staff assigned to her for the audits she has been assigned.

As mentioned earlier, prior to the announcement as a GS-343 vacancy, the position of Director, *Office of Evaluations*, had been held by two GS-511-15 Supervisory Auditors, Kenneth Clarke until December 1999, and then Andrew Pasden, both Non-Minority White Males. Thus, Ms. Carmona is concerned as to why the position was structured and filled in this manner, which limited her opportunity for promotion.

## 4.   Preferential Selection of Non-Minority White Candidates for Senior Management Positions

There is a clear long-term pattern and practice of preferential selection of Non-Minority White candidates under Age 40 for senior management positions within the Office of Audit. Other parts of the Office of Inspector General are also following the pattern of preferential Non-Minority White hiring or promotion for senior positions. Those selected include individuals without experience in the area for which they were selected and without experience in the Office of Inspector General.

Below are listed some of the selections about which Ms. Carmona is aware, with the name of the selecting official and the corresponding date, when available. A complete list of selections/promotions, with corresponding EEO statistics, should be obtained during the EEO investigation.

**Continuing Pattern and Practice of Preferential Selection of Non-Minority White Candidates Under Age 40 for Positions at the SES and Grade 15 Levels Within the Office of Audit**

Marla A. Freedman                    Non-Minority White Female Under Age 40
Deputy Assistant Inspector General for Program Audit, SES

      Selecting Official: AIG Dennis Schindel, Non-Minority White Male
      Announcement: October 21, 1998 [Attachment G (G-1)]

Thomas A. Moschetto                    Non-Minority White Male Under Age 40
Director of Financial Statement Audits, Grade 15

      Selecting official: Deputy AIG Bill Pugh, Non-Minority White Male

It should be noted that Mr. Moschetto, who was widely viewed as Deputy Inspector General Calahan's protégé, had been promoted to the Grade 14 level by Mr. Calahan shortly after

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Mr. Calahan's arrival into the Office of Inspector General. Office of Audit management subsequently selected this employee for promotion to the Grade 15 without regard for integrity issues. Specifically, Mr. Moschetto was cited during November 1997 hearings before the Permanent Subcommittee on Investigations for his role as the Contracting Officer's Technical Representative (COTR) in contracting improprieties by the Office of Inspector General.

It should also be noted that Mr. Moschetto had no experience in conducting financial statement audits at the U.S. Customs Service, which was the primary function of the office for which he was selected as Director. Louella Lontok, who Ms. Carmona understands is an Asian American/Pacific Islander Female, had been selected to serve as Acting Director when Ms. Freedman vacated this position during 1998. Ms. Lontok had years of experience as a Grade 14 on the Customs financial statement audit, and served as Acting Director for a number of months before Mr. Moschetto was selected. Ms. Lontok resigned from the Office of Inspector General shortly after Mr. Moschetto's selection.  [Attachment G (G-7)]

Michael P. Fitzgerald                      Non-Minority White Male Under Age 40
Director of Financial Statement Audits, Grade 15

> Selecting official:  Deputy AIG Bill Pugh, Non-Minority White Male
> Announcement:  May 15, 2000 [Attachment G (G-5)]
> Initially named as Acting Director effective October 25, 1999 [Attachment G (G-3)]

It should be noted that Mr. Fitzgerald, who is viewed as Mr. Elachkar's and Mr. Pugh's protégé, was brought into the Treasury Office of Inspector General as a Grade 13 lateral transfer from the Department of Commerce into a position created specifically for him at the Grade 13/14 level. He was reportedly promoted to the Grade 14, without competition, immediately upon completing a year (total of Commerce and Treasury) at the Grade 13 level.

Adam Silverman                          Non-Minority White Male Under Age 40
Director, *Office of Evaluations*, Grade 15

> Selecting Official:  AIG Dennis Schindel, Non-Minority White Male
> Announcement:  September 5, 2000 [Attachment L (L-5)]

**Continuing Pattern and Practice of Preferential Selection of Non-Minority White Candidates for Positions at the SES and Grade 15 Levels Within Other Parts of the Office of Inspector General (Age at Time of Selection Not Known)**

It should be noted that the staff was advised, first by Acting Inspector General Lawrence Rogers and then by Inspector General Rush, that prior to his confirmation Mr. Rush approved the selection to Assistant Inspector General positions at the SES level for Ms. Baebel and Mr. Tarr (see below).

Page 33 of 60

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Immediate Office of the Inspector General

Richard K. Delmar                    Non-Minority White Male
Counsel to the Inspector General, SES

Office of Management Services

Emilie M. Baebel                    Non-Minority White Female
Assistant Inspector General for Management Services, SES

Robert Hardos                    Non-Minority White Male
Deputy Assistant Inspector General for Management Services, Grade 15

This position was created in early 1999 for Mr. Hardos, who was brought in from another agency by Ms. Baebel. Immediately prior to his selection, Management Services did not have a Grade 15 position.

Office of Investigations

Thomas Blatchford                    Non-Minority White Male
Assistant Inspector General for Investigations, SES

Michael C. Tarr                    Non-Minority White Male
Assistant Inspector General for Investigations, SES

Randolph E. Stone                    Non-Minority White Male
Deputy Assistant Inspector General for Investigations, SES

There were also a number of Non-Minority White candidates selected for Grade 15 positions, both in Washington, DC, and in the Field. Below is a partial list of individuals, each of whom was selected for the position of Special Agent in Charge at the office indicated.

| | | |
|---|---|---|
| Thomas E. McCarter | Chicago Field Office | Non-Minority White Male |
| Elizabeth M. Redman | Treasury Inspections Division | Non-Minority White Female |
| Cecelia J. Rosser | Washington Field Office | Non-Minority White Female |
| David Smith | Houston Field Office | Non-Minority White Male |
| Donna M. Spiewak | Enforcement Operations Division | Non-Minority White Female |
| William E. Wess | Philadelphia Field Office | Non-Minority White Male |

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

## 5.    Failure to Properly Address EEO Concerns

As discussed in Ms. Carmona's October 18, 2000, memorandum to Secretary Summers, the Department of the Treasury has failed to properly address the EEO concerns that Ms. Carmona has raised.

Between September 1995 and the filing of the current complaint, Ms. Carmona has been forced to file eleven formal EEO complaints, none of which have been resolved, and two of which the Department of the Treasury has refused to process. The Department of the Treasury has failed to conduct proper EEO investigations, and in most cases has conducted no investigation at all. The Department of the Treasury has also failed to provide requested information. In addition, none of Ms. Carmona's requests for hearings before a fair and equitable EEOC administrative judge have been properly or timely processed and forwarded to the EEOC by the Department of the Treasury, and no hearings have been conducted or scheduled by the EEOC for any of Ms. Carmona's hearing requests.

As just one example, the Department of the Treasury has refused to process formal EEO complaint TD-99-1119, which was filed on February 5, 1999, beyond its acknowledgment and assignment of a TD number. Please note that Ms. Carmona made her initial contact for assignment of an EEO Counselor on November 17, 1998, and due to the non-assignment of an EEO Counselor for over 2 months Ms. Carmona felt compelled to file. The Department of the Treasury has refused to honor Ms. Carmona's proper request for a hearing before an EEOC administrative judge, as was properly and timely requested by Ms. Carmona on August 11, 1999. The EEOC has not honored Ms. Carmona's request for a hearing made directly with the EEOC on December 27, 1999.

**Thus, Ms. Carmona has been denied by Treasury and by the EEOC her right to have complete factual records developed, and to have proper, fair, and impartial determinations made regarding the merits of all of the issues/claims that Ms. Carmona has raised in any of the eleven previously filed formal EEO complaints.**

## 6.    Failure to Provide Requested Management and Other Professional Training

**Not Selected for Management Training**

On January 19, 2000, Ms. Carmona requested that the Office of Inspector General sponsor her to the Senior Executive Fellows Program at the John F. Kennedy School of Government at Harvard University. This was a 4-week course, held from March 13 through April 7, 2000. [Attachment M]

Ms. Carmona made this request in the context of an announcement during a budget meeting that there was a large amount of surplus funds and in the context of Inspector General Rush's statements near the end of 1999 that he would like to address executive development in the near future and that the Office

## 6.   Failure to Provide Requested Management and Other Professional Training

**Not Selected for Management Training**

On January 19, 2000, Ms. Carmona requested that the Office of Inspector General sponsor her to the Senior Executive Fellows Program at the John F. Kennedy School of Government at Harvard University.  This was a 4-week course, held from March 13 through April 7, 2000.  [Attachment M]

Ms. Carmona made this request in the context of an announcement during a budget meeting that there was a large amount of surplus funds and in the context of Inspector General Rush's statements near the end of 1999 that he would like to address executive development in the near future and that the Office

Page 35 of 60



*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

of Inspector General needed to begin preparing its Grade 14 and 15 staff for the future and invest in their training now. [*Weekly Highlights* - December 15, 1999]

The Office of Personnel Management's *Hispanic Employment Initiatives*, discussed further in **Claim 12**, also recommends executive development training as a way to increase Hispanic representation at the senior levels of an organization.

It is also Ms. Carmona's understanding that other employees have been given the opportunity to attend executive development programs, including a Non-Minority White Female at the Grade 14 who was subsequently promoted to the Grade 15.

**Not Selected for AICPA Training**

An alleged discriminating official in EEO complaints previously filed by Ms. Carmona denied her the opportunity to attend the American Institute of Certified Public Accountants (AICPA) Governmental Accounting and Auditing Conference, which was held in Washington, DC, on August 2-3, 1999.

Ms. Carmona's request for this AICPA course received the approval of Barry Savill, who was Ms. Carmona's immediate supervisor; of Arthur Henshaw, who was coordinating training for the Office of Audit; and of Marla Freedman, the Deputy Assistant Inspector General for Program Audits. See Attachment N [N-4] for a copy of the SF-182, *Request, Authorization, Agreement and Certification of Training*, initialed by Mr. Henshaw and signed by Mr. Savill and Ms. Freedman.

Mr. Savill advised Ms. Carmona that Emilie Baebel, Assistant Inspector General for Management Services, who was (and is) an alleged discriminating official in Ms. Carmona's EEO complaints and who was not in Ms. Carmona's chain of command, denied the training. [Attachment N (N-2)]

This action on the part of Ms. Baebel denied Ms. Carmona, who has been a CPA for many years, the opportunity to attend a conference that she considered very important for her career development. This action was an abuse of authority, as Ms. Baebel had no line authority over Ms. Carmona, yet she superseded the decisions made by senior managers who did have direct authority over Ms. Carmona's training.

Ms. Baebel did, however, have line authority over *Management Services*, the organization that failed to place Ms. Carmona on best qualified lists for promotion. Ms. Baebel also had line authority over the staff that placed Ms. Carmona in non-pay status, that failed to provide Notifications of Personnel Action in a timely manner, and that failed to correct an overpayment in a timely manner. See **Claims 7, 8, and 9** for a further discussion. Thus, Ms. Baebel has used her position to severely and negatively impact and ruin Ms. Carmona's reputation and her career.

It should also be noted that to obtain the Continuing Professional Education credits required of her during Calendar Year 1999, Ms. Carmona had to resort primarily to no-cost training. The Office of

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Inspector General spent only $120 on training for Ms. Carmona during that year, significantly less than was spent on other staff. [Attachment N (N-1, -3)]

## 7.    Placement in Non-Pay Status

The Office of Inspector General placed Ms. Carmona in non-pay status for Pay Period 01 of Calendar Year 2000, without warning or notification. When Ms. Carmona contacted Ms. Mingo, an African American Female Personnel Specialist responsible for processing payroll who works in Ms. Baebel's office, she was told that this had never happened to anyone else. Ms. Mingo could not give Ms. Carmona a reason for this action, and could not explain why Ms. Carmona had not been notified, and had to find out about this through contact with her financial institution. [Attachment O]

It is Ms. Carmona's understanding that employees are placed in non-pay status for disciplinary purposes, but always with advance notice and appeal rights. Ms. Carmona is concerned that her record now indicates that she was placed in non-pay status, a fact subject to intentional misinterpretation to outside parties by alleged discriminating officials within the Office of Inspector General.

Why was Ms. Carmona treated in such a disparate manner? Why was Ms. Carmona, as Ms. Mingo stated, the only employee placed in non-pay status? Why did the Office of Inspector General not notify Ms. Carmona of this action, either in advance or after the fact? And why can't the Office of Inspector General provide Ms. Carmona with a satisfactory explanation of what occurred?

Ms. Carmona is also concerned that Ms. Mingo, the individual who placed her in non-pay status, and who failed to provide her with notices of personnel actions and to correct an overpayment in a timely manner, as discussed below, was promoted effective January 30, 2000, into a career ladder position that will offer her the opportunity for significant advancement without competition. [*Weekly Highlights -* February 2, 2000]

## 8.    Failure to Provide Notifications of Personnel Action in a Timely Manner

Ms. Carmona was not provided Forms SF-50, *Notification of Personnel Action,* in a timely manner for her temporary promotion to the Grade 15, which was effective August 29, 1999. She followed up a number of times with Ms. Baebel's organization, which has responsibility for Personnel, before finally receiving a partial response to her requests on April 24, 2000, **almost 8 months** after the effective date of the initial action. [Attachment P]

Recently, Ms. Carmona received a package containing other Forms SF-50 that had not been provided to her in a timely manner. Included was a note that read, in part, *Enclosed are SF-50's on personnel actions that have been processed on you for the last year or more.* [Attachment J (J-7)]

*Current Statement of EEO Claims/Complaint.*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Ms. Carmona continues to be concerned that she is not being provided notification of Personnel actions in a timely manner. Employees are required to submit the most recent SF-50 when applying for promotion, and should have these forms immediately available to them.

## 9.   Failure to Correct Overpayment in a Timely Manner

After Ms. Carmona finally, on April 24, 2000, received the SF-50s for her temporary promotion to the Grade 15, she checked her payroll records to ensure that she had been paid in accordance with the forms, and on April 26 notified Ms. Freedman, who was her supervisor while she was Acting Director, of a possible overpayment of salary. On April 28, Ms. McCoy from Personnel wrote to Ms. Carmona, confirming the overpayment and stating that the National Finance Center would be notified to recoup the overpayment. Ms. Carmona again had to follow up a number of times to ensure that action was indeed taken. [Attachment Q]

Ms. Carmona was finally notified on September 15 that an amount would be withheld from her paycheck of October 16. To date, Ms. Carmona has not received notification of the computation of the overpayment, although she was told that she would receive a bill. Ms. Carmona submitted her latest request to clarify her concerns on December 7, 2000, with no response from Ms. Baebel's organization. [Attachment Q (Q-12)]

## 10.   Failure to Assign Appropriate Staffing

Ever since there was a decision not to fill the Grade 15 position, as discussed under **Claim 3**, and Ms. Carmona completed her assignment as Acting Director on March 11, 2000, Office of Inspector General management has failed to assign Ms. Carmona an appropriate number of staff in keeping with Ms. Carmona's grade level, with whom Ms. Carmona may complete audit assignments.

Ms. Carmona has met with Mr. Kassel on a number of occasions and requested to be assigned staff so that audits can be performed. She has also requested more responsibility, advising Mr. Kassel that she has supervised multiple teams working on a number of audits or reviews at one time, and that her skills as a manager are not being properly utilized. Ms. Carmona clearly demonstrated her ability to manage at a senior level during the two periods when she was temporarily promoted to the Grade 15 as Acting Director, first of *Quality Assurance* during 1993, and then of *Finance and Debt* during 1999.

In addition, management has been continually changing the staffing and the priority of audits that Ms. Carmona is to complete once staff is assigned to her.

As one example, the Grade 13 Auditor who was assigned as Auditor-in-Charge for the Review of the Office of the Comptroller of the Currency and the Office of Thrift Supervision Fee Assessment Practices was detailed first to an Internal Quality Assurance Review that was to take a week to 10 days, but

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

instead grew to 2 months. The same auditor was then detailed to assist in an *Office of Investigations* effort that also has expanded in terms of the amount of time required, and in the middle of that assignment was required to work on a Rating Panel. At the same time, it was decided to place the Banking audit on hold, and begin work first on a PCIE audit on debt collection, then on a Post Award Evaluation of Grant Performance of the Community Development Financial Institutions Fund instead, an audit that had initially been assigned to another Directorate within the Office of Audit.

As another example, the Grade 13 Auditor who was assigned as Auditor-in-Charge for the audit of the Treasury Offset Program that Ms. Carmona was to manage was detailed to *Financial Statement Audit*, starting in August 2000 and not expected to return until March 2001. That audit was put on hold, with a decision to instead start an audit of abandoned assets held by States, but as of December 15 Ms. Carmona had not been given any staff for that audit.

In addition, another member of the staff has recently been placed on a long-term detail to *Financial Statement Audit*.

These long-term details of *Program Audit* staff to *Financial Statement Audit* assignments seem to contradict the Inspector General's decision to downsize *Financial Statement Audit* by shifting vacant full-time equivalents to *Program Audit* operations in the Field.

There has been a similar shift of *Program Audit* vacancies from Washington, DC, to the Field, even though much of the work is being done in Washington. For example, there is a team from the Chicago Regional Office that has started what is planned to be the better part of 3 months in travel status to Washington, DC. This team of four Program Auditors is headed by a Grade 14 Non-Minority White Male Audit Manager who was just hired from the EPA, as discussed under **Claim 2**.

The team is performing an audit of Departmental Offices and three Bureaus, including the Financial Management Service (FMS), a Bureau for which Ms. Carmona has been given primary *Program Audit* responsibility. Ms. Carmona understands that other staff members from the Field may be spending considerable time in Washington, thus increasing travel costs, resulting in a waste of Federal funds.

Why is it that Ms. Carmona is not assigned appropriate staffing to conduct audits, yet a newly-hired Audit Manager from Chicago is assigned a full audit team and tasked with performing an audit in Washington, DC, in a Bureau for which Ms. Carmona has primary responsibility?

With this shift of resources, though not of the work, away from Washington, DC, Ms. Carmona is concerned that her supervisory roles and responsibilities as an Audit Manager will be significantly eroded in the future, as already evidenced to some extent through the recent Office of Audit management decisions discussed above.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Ms. Carmona is concerned that these actions evidence a pattern and practice to potentially place Ms. Carmona at a competitive disadvantage when future opportunities for promotion are announced, while other employees are being given assignments to give them a competitive advantage.

## 11.    Failure to Properly Present Results of Work

The Office of Inspector General issued its *Semiannual Report to the Congress, October 1, 1999 - March 31, 2000* with a clearly erroneous, and in fact incomprehensible, section titled *BPD's Results Act Compliance* on an audit of the Bureau of the Public Debt (BPD) for which Ms. Carmona was the Acting Director.

Action such as this are professionally and personally embarrassing to Ms. Carmona, and create a negative impression on the Congress, the Department, the Bureaus, the public, and fellow Office of Inspector General employees.

As the Acting Director, *Finance and Debt*, Ms. Carmona had submitted an appropriately written summary for this audit for inclusion in the *Semiannual Report*. It is Ms. Carmona's understanding that Ms. Baebel's organization, *Management Services*, had ultimate responsibility for the publication of this *Semiannual Report*.

The fact that the work performed by Ms. Carmona and her staff was so poorly presented while submittals by other employees were properly reflected in the *Semiannual Report* is evidence of disparate treatment, of retaliation, and of humiliation of Ms. Carmona, as a way to discredit her career. Over the years, Ms. Carmona has frequently been complimented on her management/organizational/writing skills. The manner in which the document that Ms. Carmona submitted was presented in the *Semiannual Report*, and the manner in which Office of Inspector General attorney Eric Banks, an African American Male, was allowed to revise one of Ms. Carmona's *Office of Oversight* reports, as discussed further under **Claim 20**, are two clear attempts to discredit Ms. Carmona and to belittle her skills in this area.

When Ms. Carmona expressed concern about the manner in which the section titled *BPD's Results Act Compliance* was presented in the *Semiannual Report* to Ms. Freedman, she did not receive a response. [Attachment R]

## 12.    Failure to Implement Hispanic Employment Initiatives

The Office of Inspector General has failed to implement Hispanic Employment initiatives, including those established in recent Presidential documents.

The Office of Inspector General failed to celebrate, or, for that matter, to even acknowledge National Hispanic Heritage Month. In Proclamation 7338, dated September 14, 2000, President Clinton spoke

Current Statement of EEO Claims/Complaint
Maria V. Carmona
Department of the Treasury Office of Inspector General

of the contributions of Hispanic Americans; designated September 15 to October 15, 2000, as National Hispanic Heritage Month; and called upon all Americans to observe this period with appropriate programs, ceremonies, and activities. Ms. Carmona is not aware of any action that the Office of Inspector General took to comply with this Proclamation. [Attachment S]

In Executive Order 13171, dated October 12, 2000, titled *Hispanic Employment in the Federal Government*, President Clinton noted that Hispanics remain underrepresented in the Federal workforce, making up only 6.4 percent of the Federal civilian workforce, about half of the total Hispanic representation in the civilian labor force. The President stated that the head of each agency shall establish and maintain a program for the recruitment and career development of Hispanics in Federal employment. Among the specific points mentioned were: (1) do not impose barriers to selection based on non-merit factors, and (2) promote participation of Hispanic employees in management, leadership, and career development programs. Ms. Carmona is not aware of any action that the Office of Inspector General has taken to comply with this Executive Order. [Attachment T]

Ms. Carmona also questions the impact that Treasury Directive 62-01, *Equal Opportunity Programs*, effective January 29, 1987, has had on her career. Ms. Carmona has received excellent ratings throughout her career with the Office of Inspector General. Why was she not selected, earlier in her career, for the Federal Women's Program and its Women's Executive Leadership Program? Especially considering Ms. Carmona's outstanding academic credentials, her certification as a CPA, her minority status, her demonstrated leadership and managerial qualities, her work ethic, and her outstanding performance appraisals. Also, Ms. Carmona questions what effect the Special Emphasis Program for Hispanics has had on her career. Ms. Carmona is not aware of any effect. The Office of Inspector General apparently does not participate in, or announce opportunities for, these programs.

Instead, the Office of Inspector General continues its long-term pattern and practice of discrimination, retaliation, and hostile work environment directed towards Ms. Carmona and other employees of Hispanic national origin. In addition, as discussed under **Claim 15**, Inspector General Rush is focusing attention on another minority group that is currently overrepresented in the Office of Inspector General and in the Federal government.

## 13.  Failure to Address EEO-Related Issues Identified by 1989 Task Force

During October 1989, a Recruitment Task Force chaired by Ms. Carmona and conducted at the request of Jay Weinstein, Ms. Carmona's SES-level manager at the time, issued a report that identified concerns with reference to EEO-related issues, including the underrepresentation of women and minorities in the Office of Inspector General. That report contained Office of Inspector General Personnel data as of February 22, 1989, that indicated that of a total of 82 employees in the Office of Audit (designated as AIG-A for Assistant Inspector General for Audit), two were Hispanic; one a GM-13 Hispanic Female

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

(Ms. Carmona) and one a GS-12 Hispanic Male. Thus, Hispanic employees represented only 2.4 percent of the Office of Audit. [Attachment I (I-25)]

On December 1, 1989, Jay Weinstein, a Non-Minority White Male who at the time was the AIG-A, sent Ms. Carmona a memorandum of appreciation of the work and said that the recommendations have been or are in the process of implementation. [Attachment I (I-2)]

Yet, after more than ten years, EEO concerns persist, and the underrepresentation of Hispanics in general, and, more specifically, of Hispanic Females in the Office of Audit, has not been addressed, as discussed below.

The latest data provided to Ms. Carmona indicates that the Office of Audit has only one Hispanic Female (i.e., Ms. Carmona). The data also indicates that there is one Hispanic Female in the Office of Investigations, and none in any other Office of Inspector General component.

On July 13, 2000, the Office of Inspector General shared its report titled *Affirmative Employment Program for Minorities and Women - FY 1999*. The report, included as Attachment C, stated, in part that *(t)he OIG also suffered an inordinate number of equal employment opportunity (EEO) complaints and grievances* [C-4] and indicated that there was a *significantly high turnover* [C-5]. The report stated that the *(r)epresentation of Blacks was well above the Civilian Labor Force (CLF) statistics. The overall representation for all minority groups is above the CLF statistics with the exception of Women and Hispanic Females.* [C-5]

The report pointed out that Hispanic Females represented **0 %** of the promotion actions [C-7]. The following levels of representation for Hispanic Females were cited for each of the four categories reported [C-8]: **Professional**, below CLF; **Administrative**, no representation; **Technical**, above CLF; and **Clerical**, above CLF. This data indicates that the limited Hispanic Female representation in the Office of Inspector General is clustered in lower-level positions.

## 14.  Failure to Address Other Previously Identified EEO-Related Issues

The Department of the Treasury Office of Inspector General has failed to address other serious EEO-related issues that have been identified and clearly raised to the Senior Management Group and to other authorities.

The issue of diversity within the Office of Inspector General has been raised on numerous occasions since the Recruitment Task Force concluded its work during 1989. For example, the Office of Personnel Management conducted a Work Force Effectiveness Study, and in its October 1995 report offered evidence of the hostile work environment and of the perception of a lack of Equal Opportunity that existed within the Office of Inspector General. Ms. Carmona has participated in other task forces

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

that have attempted to address the issue of a lack of diversity within the Office of Inspector General, including the Change Management Advisory Team, which concluded its efforts during February 1997, and the Diversity Task Group, which provided a report to the Senior Management Group during January 1998.

In addition, Carlton Hadden, at the time the Acting Director of the EEOC Office of Federal Operations, stated during an EEOC Town Hall Meeting on May 4, 2000, that the Department of the Treasury is one of the two worst agencies in the Federal government with reference to EEO. Yet, neither the EEOC nor the Department of the Treasury itself seems to be taking any action to address this issue.

In contrast, the U.S. Department of Agriculture, which was the other agency cited by Mr. Hadden of the EEOC, has hired outside firms to analyze the reasons behind the large number of complaints that are being filed there.

It has also been reported over the years that the Office of Inspector General has more complaints per capita than any other organization within the Department of the Treasury. This is of particular concern because the Office of Inspector General is set up, in part, to monitor and investigate problems of other entities within the Department.

Yet, as discussed above, the situation for Hispanics in general, and specifically for Hispanic Females over Age 40 in the Office of Audit, such as Ms. Carmona, has not improved.

# 15.   Inspector General Focus on One Minority Group

Inspector General Rush, an African American Male, has focused attention on advancing the status of one minority group, i.e., African Americans, that is currently overrepresented in the Office of Inspector General and in the Federal government in general, to the exclusion of a minority group that is underrepresented in both the Office of Inspector General and the Federal government, i.e., Hispanics. Recruitment efforts and a recent meeting with PCIE/ECIE members illustrates this.

The Office of Inspector General's own employment data indicate that for FY 1999, the latest year for which data have been provided to the staff, African American representation within the Office of Inspector General is more than twice the CLF (23.4 versus 10.4 percent, respectively). In sharp contrast, Hispanic representation within the Office of Inspector General is less than half the CLF (3.4 versus 8.1 percent, respectively). [Attachment C (C-8)]

The Inspector General's position is in direct contradiction to that taken by President Clinton in recently stated comments with reference to the fact that Hispanics remain underrepresented in the Federal workforce. The President's position, as stated in Executive Order 13171, requires a program for the recruitment and career development of Hispanics. [Attachment T]

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

The Office of Personnel Management has also issued very specific plans to address the ongoing underrepresentation of Hispanics in Federal service, some of which are included in Attachment U. As two examples, the Office of Personnel Management issued its *Hispanic Employment Initiatives* [U-1] during September 1997 and a President's Management Council Interagency Work Group report on *Hispanic Employment in the Federal Government* [U-4] on March 3, 1999.

The President's Management Council report states that to address the increasing underrepresentation of Hispanics in the Federal workforce, the government *must redouble* its *efforts to attract, recruit, and retain the qualified Hispanic labor pool that the civilian labor force is already using so effectively* [U-8]. The report points out that progress in improving the representation of Hispanics in many Federal agencies has been slow, and strongly encourages workforce diversity efforts.

In addition, the President's Management Council report states that on October 8, 1998, the Office of Personnel Management launched a new 10-point plan that focuses on developing applicant pools that are rich in qualified Hispanic candidates for job vacancies at all levels and providing career development opportunities [U-8].

The report states that efforts to increase the representation of Hispanics in the SES should focus on objectives such as helping prepare Hispanics to become more competitive for SES opportunities, including the use of an executive development program as part of an agency's succession planning. Under the objective of increasing the number of Hispanics in the selection pool are a number of suggestions regarding recruitment strategies, including the use of an entry-level intern program to recruit and develop Hispanic employees and the appointment of a Hispanic Employment Program Manager.

To Ms. Carmona's knowledge, the Office of Inspector General does not have an executive development program or a Hispanic Employment Program Manager and is not following the recruitment and employee-development strategies.

**Recruitment at Historically Black Colleges and Universities for African American Students**

When Ms. Sisselberger, the Office of Inspector General's former EEO Officer, presented the latest recruitment program to managers at a September 27, 2000, meeting, she made it very clear that Inspector General Rush wants the recruitment to take place only at Historically Black Colleges and Universities (HBCUs), so that African American students can participate in an internship program and eventually be hired on a permanent basis by the Office of Inspector General. Ms. Sisselberger stated, as an afterthought, that *if we find a good Hispanic student, there is nothing wrong with hiring them, but Rush wants to start with HBCUs and focus on African American students.* Ms. Sisselberger also stated that she could not remember the name of the Hispanic program, and made no mention of Inspector General Rush or the Office of Inspector General considering participation in this program.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Ms. Carmona found the attitude communicated by Ms. Sisselberger's comments to be demeaning of individuals of Hispanic national origin.  And the fact that the organization's long-term EEO Officer does not remember the name of the Hispanic program is indicative of the lack of emphasis given to it by the Office of Inspector General.

Ms. Sisselberger further stated that *the culture and negativism* of the Office of Inspector General would need to be explained to the students who are selected.  Ms. Carmona feels that this statement reveals Ms. Sisselberger's personal perception of a discriminatory, retaliatory, and hostile work environment.

Inspector General Rush's position of focusing recruitment at HBCUs seems to be contradictory to the statement made in the Office of Inspector General's *Affirmative Employment Program for Minorities and Women - FY 1999*, included in Attachment C, that *(a)s a modest first step in improving underrepresentation, the OIG has expanded its recruiting efforts to reach a wider audience of qualified Females and minorities* [C-6].  This report clearly stated that *(r)epresentation of Blacks was well above the Civilian Labor Force (CLF) statistics* [C-5].

**Inspector General Meeting with PCIE/ECIE Members**

On October 10, 2000, Inspector General Rush hosted a meeting with the PCIE/ECIE African American Inspectors General to discuss *ways to encourage African Americans to seek appointed office*.  There has been no indication that the Inspector General has taken or is taking similar steps to increase the representation of other minority groups, including Hispanics.  [*Weekly Highlights* - October 11, 2000]

## 16.  Department of the Treasury EEO Training Material Fosters Misconceptions About Hispanics

The Office of Inspector General required that employees complete the Department of the Treasury's training on the *Management Aspects of EEO*.  The training contained an incorrect definition of Race that fosters misconceptions about Hispanics.

This Department of the Treasury training was presented in a self-paced format on a CD-ROM as part of a Computer Based Training initiative and consisted of five sections:  Sexual Harassment, Disability, Personnel Practices, Complaint Process, and Resolution.  Under a section of the CD-ROM titled *Bases of Prohibited Discrimination*, portions of which are included in Attachment V, the definition given for *Race* was as follows.

> *Race refers to a person's identification with a particular ethnic category.  The most commonly recognized racial designations are African-American or Black; Hispanic; Asian American/Pacific Islander, Native American, and Caucasian or White.* [V-3]

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

This definition of Race includes Hispanic, which is a designation of National Origin, not Race.

The definition given for **National Origin** on the Department of the Treasury's CD-ROM is as follows.

> *A basis of discrimination complaints which refers to the birthplace of an individual; that*
> *individual's ancestors; or cultural or linguistic characteristics common to an ethnic group*
> *(such as an accent or speaking in a foreign language).*  [V-4]

The data on the bases of discrimination in the Department of the Treasury CD-ROM is also presented in a misleading manner. Race and National Origin are combined into one category, even though these are two totally distinct bases of discrimination, and even though an employee may claim either Race or National Origin, or both, as bases of discrimination.

In addition to the CD-ROM training, Department of the Treasury managers were given a diskette to copy onto their computer systems for future reference, with a program titled *EEO Assistant for Managers*. Under a section titled *Race Discrimination*, the *EEO Assistant for Managers* stated the following. [Attachment V]

> *Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race.*
> *The most common racial designations are:*
> - *African-American or Black;*
> - *Hispanic;*
> - *Asian;*
> - *Native American; and*
> - *Caucasian or White.*
> *It is also illegal to discriminate on the basis of <u>immutable characteristics</u> associated with*
> *race or based on stereotypes or assumptions about individuals or certain racial groups.* [V-6]

The *EEO Assistant for Managers* defines immutable characteristics as *(p)hysical characteristics which cannot be changed, such as skin color, hair texture, or certain facial features.*  [V-6]

Again, Hispanic is presented as a designation of Race rather than of National Origin.

It concerns Ms. Carmona that official documents of the Department of the Treasury would foster such a major misunderstanding of Race and of National Origin, and that such documents would be disseminated as training to Department of the Treasury employees nationwide.

The Office of Inspector General indicated its approval of the above Department of the Treasury statements in its report titled *Affirmative Employment Program for Minorities and Women - FY 1999* by indicating that *(t)his training provides consistent and accurate training locally and allows Supervisors and Managers in hard-to-reach areas (regional/field offices) to receive comparable training*. [Attachment C (C-10)]

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

This continues the pattern of misinformation that Ms. Carmona identified in prior material disseminated by the Department of the Treasury, where there was reference to Hispanics as *people of color*.

# 17.  Failure to Properly Administer EEO Requirements

The Office of Inspector General has failed to properly administer its EEO requirements, as stated in 29 CFR 1614 and EEO MD-110.  For example, the Office of Inspector General does not have an EEO Officer, and, when it did, the EEO Officer reported at too low a level within the organization. Also, to Ms. Carmona's knowledge, there are no Special Emphasis Program Managers for programs such as the Federal Women's Program and the Hispanic Employment Program, as required in EEO MD-110, Chapter 1, Section V.  This has disadvantaged Ms. Carmona and her ability to properly and timely pursue her EEO concerns.

Even though it currently does not have an EEO Officer, the Office of Inspector General continues to display a poster that indicates that Bobbie Sisselberger, (202) 927-5759, is its EEO Manager, and that its EEO Counselors are as follows.  [Attachment B (B-1)]

| | |
|---|---|
| Karen L. Bradshaw | (202) 927-5023 |
| Elizabeth R. Haskett | (317) 298-1596 |
| Sherrie A. Richardson | (202) 927-5231 |
| Timothy J. Upham | (202) 927-5012 |
| Clara J. Veal | (713) 706-4611 |

It should be noted that the language of this poster also contradicts separate written instructions in a May 30, 1997, memorandum for all Office of Inspector General employees from Inspector General Valerie Lau, which states that *(t)he OIG EEO Officer is Bobbie Sisselberger* and that *all requests for assignment of an OIG EEO Counselor (both within the OIG and outside requests) must be obtained and coordinated through the OIG EEO Officer.*  To Ms. Carmona's knowledge, this memorandum has not been superseded.  [Attachment B (B-3, -4)]

On September 25, 2000, when Ms. Carmona contacted Ms. Sisselberger regarding her concerns about the assignment of office space and furniture, Ms. Sisselberger advised that she was no longer functioning as the EEO Officer, that she had been relieved of this duty as of August 13, 2000, and that she no longer had a role in the EEO process.  Ms. Baebel, Assistant Inspector General for Management Services and Ms. Sisselberger's SES-level supervisor, told Ms. Carmona that there is no currently assigned EEO Officer for the Office of Inspector General.

It is Ms. Carmona's understanding that Ms. Bradshaw and Mr. Upham no longer work for the Office of Inspector General.  Also, the telephone numbers for Ms. Sisselberger and Ms. Richardson have been changed.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Office of Inspector General employees, then, are not being properly advised of their EEO rights, as required.

## 18.    Breach of Confidentiality

As discussed above, the Office of Inspector General continues to hold out Ms. Sisselberger as its EEO Officer, even though Ms. Sisselberger is no longer functioning in this capacity. A Departmental Official, Susan Morris of Secretary Summers' EEO staff, confirmed that the Office of Inspector General does not have an EEO Officer.

This failure to properly designate an EEO Officer and advise Office of Inspector General employees of the new EEO Officer's name has resulted in a breach of confidentiality for Ms. Carmona, who contacted Ms. Sisselberger in good faith, as discussed immediately above and in the Background section of this document.

It should be noted that even though Ms. Carmona brought a prima facie case of disparate and discriminatory treatment to the attention of Ms. Sisselberger, Ms. Baebel, and Ms. Freedman, there has been no resolution to the matter.

Appendix B of EEO MD-110 cites the right of complainants to anonymity during the informal stage of an EEO complaint. In addition, the Office of Inspector General EEO poster states that *(y)our name will be kept confidential unless you say otherwise, or unless you file a formal complaint.* [Appendix B (B-2)]

Office of Inspector General staff are continuing to contact Ms. Sisselberger as if she were the EEO Officer. As such, each individual's contact with Ms. Sisselberger represents a breach of that individual's confidentiality.

Given these current circumstances, there is no way under the mandated requirements of EEO MD-110 for an Office of Inspector General employee to initially raise an EEO issue or complaint with the guaranteed right of confidentiality.

## 19.    Preferential Treatment of Non-Minority White Employees

There have been a number of actions on the part of the Office of Inspector General that demonstrate preferential treatment for Non-Minority White employees. These include selection without competition for unannounced newly-created positions, with associated moves to Washington, DC; offers of early retirement for specific employees; and special arrangements, such as part-time positions or authorization to work from home.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Non-Minority White employees have been selected without competition for unannounced newly-created positions. For example, Robert Taylor, a Grade 14 Non-Minority White Male Financial Statement Auditor, was selected to function as the Special Assistant to Marla Freedman, the Non-Minority White Female who is Deputy Assistant Inspector General for Program Audit.

Ms. Carmona is concerned that, as happened with Ms. Freedman, an employee with *Financial Statement Audit* experience has been selected to a key position within *Program Audit*. Mr. Taylor was placed, without competition, into an unannounced position that gives him daily access to senior management and has involved him in all aspects of *Program Audit* operations. This position did not exist prior to Mr. Taylor's selection. In addition, the Special Assistant to the Inspector General is a Grade 14, so Ms. Carmona questions how Ms. Freedman, who is three organizational levels below the Inspector General, could also have a Special Assistant at this level.

It is Ms. Carmona's concern that the experience that has been, and will be, given to Mr. Taylor in his position as Special Assistant to Ms. Freedman will give him a large competitive edge when the next Grade 15 position is announced within *Program Audit*.

In addition, in a revised organizational chart that was provided to Ms. Carmona on November 15, 2000, Mr. Taylor is listed as a Grade 14 Audit Manager directly under Mr. Henshaw, a Grade 15 Non-Minority White Male, who is shown as the Director of *Policy, Planning & Quality*. Mr. Taylor is shown as the supervisor for two employees. To Ms. Carmona's knowledge, Mr. Taylor does not report to Mr. Henshaw and has not supervised anyone since Ms. Freedman transferred him to *Program Audit*. [Attachment W (W-1)]

Mr. Henshaw has announced that he will retire effective January 3, 2001. This creates the appearance that once Mr. Henshaw retires, Mr. Taylor will be named Acting Director and then promoted to the Grade 15 position, denying Ms. Carmona an opportunity to compete fairly for promotion.

It should also be noted that, when she was a Director in *Financial Statement Audits*, Ms. Freedman transferred Mr. Taylor from the Indianapolis office to Washington, DC, without having an announced position, to Ms. Carmona's knowledge. Based on these and other circumstances, one cannot help but question the personal relationship between Ms. Freedman and Mr. Taylor.

In a situation similar to Mr. Taylor's within the Office of Audit, Robert Todero, a Grade 14 Non-Minority White Male Financial Statement Auditor in the Indianapolis office, who is considered a crony of Mr. Pugh and Mr. Elachkar, was later moved to Washington, DC, at a time when there were no vacancies at that grade level. His position in Indianapolis was not abolished, and has been held by a number of acting assignments. When a Grade 14 position subsequently opened in Washington, Mr. Todero was placed into it, thus denying Grade 13 staff who had been in Washington for long-term periods the opportunity to apply for promotion.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

In another similar situation within the Office of Audit, Katherine Leone, a Grade 14 Non-Minority White Female Financial Statement Auditor in Washington, DC, was moved to *Program Audit*, reportedly reporting to Ms. Freedman. Ms. Leone was given special assignments. For example, she was placed in a position of leading a Quality Assurance Review of *Program Audit* operations, even though her experience with the Treasury Office of Inspector General had all been in *Financial Statement Audit*. More recently, Ms. Leone has been given a senior *Program Audit* position on the external Peer Review of another Federal agency.

It should be noted that Ms. Leone is included under *Enforcement Audits*, which reports to Mr. Savill, in the *Program Audit* portion of the revised organizational chart, even though, to Ms. Carmona's knowledge, Ms. Leone has not worked in this organization or reported to Mr. Savill. This leads Ms. Carmona to question what plans the organization has for this individual with *Financial Statement Audit* experience to block Ms. Carmona's opportunity for promotion within her own organization, *Program Audit*. [Attachment W (W-1)]

It should also be noted that the organizational charts of the Office of Inspector General may not accurately reflect the assignment of personnel, as illustrated by Mr. Taylor's and Ms. Leone's cases.

In similar situations within the Office of Investigations, Richard I. Leaf, who was the Grade 15 Non-Minority White Male Special Agent in Charge of the Los Angeles office, was moved to Washington, DC, reportedly as a Special Assistant, and Emily Coleman-Ball, a Non-Minority White Female, was moved from Washington, DC, to a newly-created position in her desired retirement location of Glynco, Georgia.

In the four cases mentioned above, then, the Office of Inspector General has paid for a Non-Minority White employee to relocate into an unannounced newly-created position, thus failing to give other employees the opportunity to compete. This represents a continuation of a long-term pattern and practice within the Office of Inspector General, which in the past moved Grade 15 Non-Minority White staff to Washington, DC, to block Ms. Carmona's and other employees' opportunity for promotion. Two specific prior examples are Barry Savill and Stephen Hachten.

Other benefits, including that of early retirement, have been offered exclusively to selected Non-Minority White employees. To Ms. Carmona's knowledge, the Office of Inspector General did not have special early-out authority when the early-retirement actions were taken. In each case, the employee's function continued to exist, and was assigned to other employees. Two Non-Minority White employees in the Office of Audit who benefited from these offers were William J. DiVello and Andrew J. Pasden. It is Ms. Carmona's understanding that similar offers have been made to Non-Minority White employees in other parts of the organization, including Anne Marie Gould in Management Services.

There have also been special arrangements made for selected employees, such as part-time positions or authorization to work from home.

Page 50 of 60

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

These benefits clearly illustrate an environment of disparate treatment where privileges are selectively extended to Non-Minority White employees.

## 20.  Actions that Pit One Minority Group Against Another

Ms. Carmona has faced many situations where it appears that Office of Inspector General management is pitting employees of one minority group against employees of another minority group. The examples discussed below illustrate how these actions by management create a hostile work environment.

During 1994, senior Department of the Treasury Federal officials approved of and allowed African American employees to singularly organize, conduct, and engage in several meetings, among themselves, with senior Department officials, and with Ms. Carmona and fellow Federal employees, during normal working hours and within Federal spaces. The direction given to Ms. Carmona by her management during some of these meetings violated her rights under the first amendment of the Constitution of the United States, i.e., the Establishment Clause.

Specifically, on February 17, 1994, during an officially sanctioned Federal meeting held during normal working hours in Federal spaces, Ms. Carmona and other Federal employees who worked for the Department of the Treasury Office of Inspector General were directed to stand and be led in prayer by a minister and to stand and sing the *Black National Anthem* by Department of the Treasury Office of Inspector General management.

Senior Department of the Treasury officials, including Deputy Inspector General Robert Cesca and General Counsel Francine Kerner, approved the agenda prior to the meeting. Senior Department of the Treasury officials were present at the meeting and actively participated in these activities.

The master of ceremonies, Chester White, an African American Male, and the opening speaker at the meeting, Grace Sutton, an African American Female, were management officials at the Grade 15 and Grade 14 levels, respectively. These two individuals and other African American employees who were present at the meeting proceeded to exhibit through their actions and statements an extremely overt militant and derogatory attitude toward Department of the Treasury management and established a threatening environment during the meeting that was to carry over into the workplace for months following the meeting.

On March 15, 1994, there was an officially sanctioned Federal meeting held to address the concerns of African American employees, to the exclusion of the concerns of all other Office of Inspector General employees. The meeting was run by a Focus Group of five African American employees, under the leadership of Mr. White, who had been the master of ceremonies of the February meeting.

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Ms. Carmona attended this meeting because it was initially presented as a meeting scheduled for all Office of Inspector General employees to express their concerns. However, at the start of the meeting, Mr. White announced that the purpose of the meeting was to address only African American concerns, and that all other Office of Inspector General employees would have to *fend for themselves*. Ms. Sisselberger, who was the EEO Officer at the time, immediately stated that this could not be done, but she was ignored, and the meeting proceeded. It is Ms. Carmona's understanding that minutes were taken during this meeting.

Following this meeting, members of the Focus Group had numerous meetings with Department of the Treasury senior management, including the highest-ranking African American official in the Department, Ronald K. Noble, who was the Under Secretary of the Treasury for Enforcement, with whom the Focus Group met with former Secretary of the Treasury Lloyd Bentsen's approval.

Following these meetings, it was made clear to Ms. Carmona that she was expected, in the words of her senior manager, Assistant Inspector General Gary Whittington, to make African Americans *happy*. Also, following these meetings, charges and accusations, some unfounded, were made by African American employees against their supervisors and management.

In one case, Ms. Carmona was told that a certain accusation made was not really against her and that, in making this accusation, Ethel Taylor, a Grade 13 African American Female, was just going along with her group. Ms. Carmona had discovered that unfounded and frivolous statements were being made about her to her supervisor by Ms. Taylor, who subsequently told Ms. Carmona that she (Ms. Taylor) just needed to go along with her group, and that Ms. Carmona was not supposed to find out that this was being done. Ms. Taylor admitted to Ms. Carmona in private that she had no basis for the accusation that she had made against Ms. Carmona.

Also, Mr. White, a Grade 15 African American Male, accused Ms. Carmona in writing of *thwarting* his career after she raised concerns to her management regarding the above-stated actions taken by Mr. White and others during these meetings.

Ms. Carmona found the types of actions being taken by members of this federally protected group to be extremely hostile, and felt that they had created a very unhealthy and hostile work environment.

It concerned Ms. Carmona that their actions were having a severe and extremely negative impact on the overall productivity of the Office of Inspector General and had done so for several months.

It also concerned Ms. Carmona that senior management was not intervening to address this hostile and counterproductive work environment and was, in fact, supporting the actions being taken.

Management approval of these events was further evidenced by actions such as the promotion, within a short period of time, of Mr. White to Deputy Assistant Inspector General for Investigations, and of Ms. Sutton to the Grade 15 Regional Inspector General for Investigations. There were also statements

*Current Statement of EEO Claims/Complaint*
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

made by senior management of the need, and plans, to *accommodate* at least one other member of the Focus Group, made up entirely of African American employees, with a promotion.

Other members of the protected group continued to criticize management at various levels, with no basis in certain cases and with the explanation that they just needed to go along with their group, seemingly with no intervention from senior management.

Employees who expressed concerns regarding these activities, including Ms. Carmona, were met with immediate, severe, and harsh retaliation by Department of the Treasury management.

It was clear that senior Department of the Treasury management condoned these activities by their approval of these meetings and their agendas, by their funding of these meetings, by their presence at these meetings, by their active participation, and by the subsequent promotion of key individuals involved to senior management levels.

Initially, feeling increasingly threatened and uncomfortable with the situation, Ms. Carmona addressed her concerns regarding these events to senior management within the Office of Inspector General. Ms. Carmona then sent a memorandum to the Legal Counsel and Ethics Officer of the Office of Inspector General requesting an opinion on the legal and ethical implications of the events that occurred at the February and March 1994 meetings. Because the matters were not addressed, Ms. Carmona subsequently notified senior Department of the Treasury management, first Secretary Lloyd Bentsen in September 1994, and then newly-appointed Secretary Robert E. Rubin and Inspector General Valerie Lau in early 1995, of her concerns.

Due to the severe retaliation that Ms. Carmona was experiencing and the negative decisions that were being made by management regarding her career, following her raising concerns to Treasury Secretaries Bentsen and Rubin and to Inspector General Lau, Ms. Carmona subsequently pursued the violation of her rights under the Constitution of the United States and the illegal retaliation against her for having raised her concerns with the Office of Special Counsel, the Merit Systems Protection Board, the U.S. Court of Appeals for the Federal Circuit, and the U.S. Supreme Court.

Also during this racially sensitive time, Ms. Carmona's Director, William J. DiVello, a Grade 15 Non-Minority White Male who reported directly to Mr. Whittington, an SES-level Non-Minority White Male, requested that Ms. Carmona sign as the Rating Official on the performance appraisal for Ms. Taylor, an African American Female whom Ms. Carmona had not supervised for the majority of performance period. William S. Schroeder, the Grade 14 Non-Minority White Male Audit Manager who had supervised Ms. Taylor for the majority of the performance period and who was actually preparing the appraisal, was going to drop Ms. Taylor's rating from what she had received the prior year. For this reason, it was thought that Ms. Taylor was going to file a discrimination complaint based on her appraisal. It was Ms. Carmona's understanding that both Mr. DiVello and Mr. Schroeder had been named previously in EEO-related issues. Ms. Carmona felt that, by being asked to sign as the

Current Statement of EEO Claims/Complaint
*Maria V. Carmona*
*Department of the Treasury Office of Inspector General*

Rating Official, she was being set up to take responsibility for any complaint Ms. Taylor might file. Thus, two employees of different minority groups would have been pitted against each other.

Ms. Carmona was subsequently placed in a position of having an Office of Inspector General attorney, Eric Banks, an African American Male, edit and re-edit, over a period of months, making minor editorial revisions that did not involve legal issues, an *Office of Oversight* report that Barry Savill, Ms. Carmona's Director at the time, had already approved. Yet, Mr. Savill made no effort to intervene in this process.

Ms. Carmona questions what purpose the review by Mr. Banks served, other than to attempt to discredit Ms. Carmona's work and to delay the issuance of the report, thus contributing to the hostile work environment directed towards Ms. Carmona by the Department of the Treasury. It would be clear to an objective fact finder that there was no other purpose served.

It is Ms. Carmona's understanding that Mr. Banks was promoted to a Grade 14 around the time of these actions.

Similarly, Ms. Mingo, an African American Female, was promoted to a career-ladder position at around the time that she played a key role in placing Ms. Carmona in non-pay status, in failing to provide notices of Personnel action, and in failing to correct an overpayment on Ms. Carmona's account in a timely manner.

The situation where Ms. Carmona's Director suggested that she directly discuss the issue of office space with Mr. Best, an African American Male, as explained under **Claim 1**, is another example where two employees from different minority groups would have been pitted against each other.

At times, Non-Minority White employees have been pitted against, or been allowed to use their positions to discredit, minority employees. For example, during 1992, Jerry Garbinski, a Non-Minority White Male, who was assigned to the *Office of Quality Assurance*, used personal information that he had learned about Ms. Carmona against her in a public forum. From reviewing Ms. Carmona's personnel file while conducting a quality assurance review of the Personnel Office, Mr. Garbinski learned that an update of Ms. Carmona's background investigation had not been completed in a timely manner, which was true for a large percentage of Office of Inspector General employees at that time.

Mr. Garbinski used this information in an attempt to publicly humiliate and discredit Ms. Carmona in front of her peers at an off-site conference. Ms. Carmona was told by one of Mr. Garbinski's co-workers that Ms. Carmona's name had been specifically selected because they knew Ms. Carmona. It is Ms. Carmona's perception that Mr. Garbinski's actions were condoned by Maurice (Bud) Moody, a Grade 15 Non-Minority White Male who had been Mr. Garbinski's Director during 1992.