UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Maria V. Carmona
8306 Haven Hill Court
Laurel, Maryland 20723
301-490-4328


V.                                          CIVIL ACTION NO. 05cv1194 (JGP)


John W. Snow
Secretary of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC  20220


## PLAINTIFF STATEMENT REGARDING DEFENDANT'S
## FALSE STATEMENTS AND PERJURY BEFORE THE COURT

1    In an *Unsworn Declaration Under Penalty of Perjury*[1] purportedly executed on July 19,

2    2002, and submitted to the Court in Defendant's September 30, 2005, *Motion to Dismiss or*

3    *for Summary Judgment* [#14, D.Ex. 4][2] Assistant Inspector General for Audit (AIGA) Marla A.

4    Freedman committed perjury, knowingly making false statements material to Plaintiff's case, as

5    presented in this statement to the Court with supporting documentary evidence.[3]  Plaintiff asserts

6    that Defendant's presentation of a false declaration before this Court also evidences pretext.

---

[1] The *Declaration* states that it is made in accordance with the provisions of 28 U.S.C. 1746, and ends with the following statement: *I declare under penalty of perjury that the foregoing is true and correct.*
[2] D.Ex. refers to Defendant Exhibit; P.Ex. to Plaintiff Exhibit.  It is noted that many of the P.Ex. included in this *Plaintiff Statement* were submitted as evidence in the five EEO complaints that are the subjects of 05cv1194 (JGP).  These documents are included here again for ease of reference.
[3] It is noted that this *Plaintiff Statement* addresses only the content of AIGA Freedman's above-cited *Unsworn Declaration Under Penalty of Perjury*.  This *Plaintiff Statement* presents false statements by Freedman that have been identified by Plaintiff as of the date of filing, and does not preclude the subsequent identification of other false statements in this or other documents submitted by Defendant.

RECEIVED

APR 1 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

7    In addition, Plaintiff asserts that Freedman's perjurious declaration before the Court is a

8    continuation of the pattern and practice of false statements by Defendant that Plaintiff brought to

9    the Court's attention in related case 04cv0589 (JGP), specifically with reference to statements

10    provided by current Deputy Inspector General Dennis Schindel, former Deputy Assistant

11    Inspector General William Pugh, and former Director Antoine F. Jabre-Elachkar.[4]

12    Plaintiff is filing this *Plaintiff Statement* in advance of her *Opposition to Defendant's Motion*

13    *to Dismiss or for Summary Judgment*, which is to be filed on or before April 18, 2006, to bring

14    forward what is a very serious matter.

15    Plaintiff asserts that the type and extent of material false statements and misrepresentations in

16    AIGA Freedman's *Declaration* calls into question Defendant's credibility in his entire *Motion to*

17    *Dismiss or for Summary Judgment* [#14] in this civil case; in the nineteen formal administrative

18    EEO complaints that Plaintiff has been forced to file to date; and in the three other civil cases

19    that Plaintiff has been forced to file to date in pursuit of her right to equal employment

20    opportunity.  [01cv0115 (CKK), related case 04cv0589 (JGP), and related case 05cv2428 (JGP)]

21    Plaintiff also asserts that the type and extent of Freedman's perjury provides indisputable

22    evidence and support for Plaintiff's claim of conspiracy by officials of the United States

23    government to deny Plaintiff her civil right to equal employment opportunity.

---

[4] See *Plaintiff's Opposition to Defendant's Motion to Dismiss and for Summary Judgment* [# 16] in related case 04cv0589 (JGP), particularly Plaintiff's detailed disputation [#16, P.Ex. D] of statements provided by Schindel, Pugh, and Elachkar.

24     AIGA Freedman's *Unsworn Declaration Under Penalty of Perjury* is presented in a

25     numbered question and answer format,[5] which is also used below, with Freedman's statements

26     presented in ***bold italics***, followed by Plaintiff's explanations of why some of Freedman's

27     statements constitute perjury, and why Plaintiff challenges other statements made by Freedman

28     based on available evidence.[6] Plaintiff also provides indisputable evidence of Freedman's

29     perjury in the exhibits that are part of this *Plaintiff Statement*. It should be noted that Freedman

30     makes reference to attachments to her *Unsworn Declaration Under Penalty of Perjury* which

31     do not appear to have been provided with Freedman's *Declaration* [#14, D.Ex. 4], including a

32     floor plan (*id.*, Pg. 3) and e-mail messages (*id.*, Pgs. 3, 4, 5).

33     **Question 7.** What is your supervisory/working relationship with the Complainant[7] and the

34     duration of this relationship?  [#14, D.Ex. 4, Pg. 1]

35     Freedman's Response (partial):

36     ***When I was Deputy Assistant Inspector General for Audit, my supervisory relationship***

37     ***with the complainant was second line supervisor.*** [#14, D.Ex. 4, Pg. 2]

38     This is a false statement. Freedman knows that this is a false statement because Plaintiff

39     reported directly to Freedman during the period August 29, 1999, through March 11, 2000, when

---

[5] The same question numbers are used more than once in Freedman's *Declaration*. It is for this reason that the question numbers do not appear in sequence in this *Plaintiff Statement*. Corresponding page numbers are also provided for this reason.
[6] Plaintiff notes that Defendant was nonresponsive to Plaintiff's discovery requests [Ref. 04cv0589 (JGP), #62, Exhibit B]. Plaintiff asserts that full and complete responses to all of Plaintiff's discovery requests may uncover further evidence of perjury by Defendant.
[7] Freedman's *Unsworn Declaration Under Penalty of Perjury* was signed before Plaintiff filed this civil action. The term *complainant* was used to refer to Plaintiff during the administrative EEO process.

40    Plaintiff served as Acting Director, Office of Finance and Debt.[8]  Freedman interfaced
41    with Plaintiff on a regular basis, had direct knowledge of Plaintiff's work, and was very
42    complimentary of Plaintiff's leadership of the office.  Evidence includes, but is not limited to,
43    the following.[9]

44          a.  Freedman selected Plaintiff to serve in an Acting capacity as one of the Directors
45              who reported directly to Freedman in her position as Deputy Assistant Inspector General
46              for Audit.  The *Notification of Personnel Action* indicates that Plaintiff was temporarily
47              promoted to a GM-0511-15 Supervisory Auditor position, for a period designated as
48              effective 08/29/99 NTE[10] 12/25/99.  (P.Ex. A)  When this period ended, Plaintiff
49              continued in an Acting Director capacity, without the corresponding increase in grade
50              or comparable salary, until March 11, 2000.  Further evidence of this is provided in
51              *Items b-g* below and related exhibits.

52          b.  Freedman gave Plaintiff her appraisal for the period and signed the corresponding form
53              as the *Rating Official*.  The *Performance Evaluation* (P.Ex. B) indicates that the rating
54              was given by Freedman, and the form signed by both Freedman and Plaintiff, on June 20,
55              2000, and shows Freedman's title as DAIGA.  Freedman's initials are also included

---

[8] The dates August 29, 1999, through March 11, 2000, correspond with the dates that Plaintiff used in her *Statement of Significant Accomplishments* for the period when she served as Acting Director, Office of Finance and Debt. In general, Treasury OIG Acting assignments corresponded to pay periods, which lasted 2 weeks, began on a Sunday (e.g., August 29, 1999) and ended on a Saturday (e.g., March 11, 2000).  Plaintiff notes that in Plaintiff's performance appraisal for the period Freedman entered 8/26/99 – 3/11/00. (P.Ex. B, Pg. 3)
   In her *Declaration*, in response to a question about her employment for two years prior to her current position, to which she has been assigned since March 2001, Freedman stated that she was the Deputy Assistant Inspector General for Audit (DAIGA) [#14, D.Ex. 4, Pg. 1].  Thus, Freedman was the DAIGA for the August 1999 to March 2000 period addressed.
[9] Plaintiff wishes to call witnesses before a jury for additional evidence.  A list of witnesses will be provided at the appropriate time.
[10] NTE stands for Not To Exceed, and is often used to designate temporary promotions which are not to exceed 120 days.

56    by the two additional performance elements that applied to supervisory positions,

57    i.e., *Effective Supervision and Management* and *Equal Opportunity and Diversity.*

58  c.  Plaintiff received a performance award for this appraisal period. Such an award

59    would have been indicative of the level of performance discussed in *Item d* below.

60    The corresponding *Notification of Personnel Action* shows the amount of the cash award,

61    with an effective date of 07/17/00. (P.Ex. C)

62  d.  In discussing Plaintiff's assignment as Acting Director, Freedman praised Plaintiff for the

63    very positive effect that Plaintiff had on the functioning of the office and for all that was

64    accomplished during this period, which lasted more than 6 months. Freedman told

65    Plaintiff that she did an *exceptional job* as Acting Director, that she was a pleasure to

66    work with, and that she demonstrated capabilities to the point where Freedman knew she

67    did not have to worry about anything, giving her a sense of confidence that the area was

68    being handled well.

69    With reference to managerial skills, Freedman stated that Plaintiff kept on top of

70    everything, could answer questions, and always turned things in on time or early.

71    Freedman told Plaintiff that her organizational skills were a *real plus* for management

72    positions, that she knew she could rely on the quality of Plaintiff's products,[11] and that

73    Plaintiff's audit report packages always came up well-organized, complete, and neatly

74    presented.

---

[11] Freedman contrasted this to work products that she received from other Directors, which she stated required review with a *fine-toothed comb.*

75    Freedman also told Plaintiff that the others who had served as acting had done a good

76  job, that everyone brought something different to the job, but that Plaintiff did an

77  *exceptional job.*  Freedman stated that she was not promising anything, but that if there

78  were an opening for a Director in Program Audit.... Freedman stated that there should be

79  openings, including some retirements within the next couple of years, and that she didn't

80  know if Plaintiff would have the patience to stay until that point.[12]

81  e. Freedman nominated Plaintiff, as Acting Director, and members of Plaintiff's staff,

82   for a *Special Act Award* for work performed during the August 1999 to March 2000

83   time frame.  Plaintiff is providing (1) the *Recognition of High Level Performance*,

84   OIG Form 2130.1 (unsigned), (2) the *Notification of Personnel Action,* and

85   (3) the *Certificate of Appreciation for Special Act* for this award.[13]  (P.Ex. D)

86   It should be noted that Plaintiff requested a copy of the official nomination/justification

87   documents in discovery, but Defendant was not responsive.  [Ref. 04cv0589 (JGP), #62,

88   Exhibit B, Item 3 under *Requests for Production of Documents.*]  However, it is

---

[12] The comments made by Freedman during this discussion of Plaintiff's performance parallel those made by others throughout Plaintiff's over 20-year career with the Treasury OIG, to include current Deputy Inspector General Dennis Schindel during 1991 when he gave Plaintiff an *Outstanding* rating and a performance award, as documented in related case 04cv0589 (JGP) [#16, P.Ex. C-2 (3 pages)] and those in the Performance Evaluation with an *Exceptional Performance* rating for Plaintiff for the period July 1, 2001, through June 30, 2002, submitted by Defendant as evidence in related case 05cv2428 (JGP) [#6, D.Ex. 3, Pgs. numbered 79-88, including *Rating Official Comments* at Pg. 85].  The comments made during 1991, 2000, and 2002, as well as the performance and special act awards, all evidence Plaintiff's high level of performance over the long term.
[13] Please note that, in the interest of privacy, Social Security numbers and the names of some staff members have been blocked out by Plaintiff on copies of some of the documents provided.  Copies including these elements are available on request.

89      Plaintiff's understanding that Freedman signed the award form,[14] as evidenced by

90      an e-mail message that was sent to Freedman on April 12, 2000, by the Treasury Office

91      of Inspector General (OIG) office that processed the award, which states, in part,

92      *The Special Act awards you requested for Carmona*... (and three others) ...*has been*

93      *processed effective 3/26/00.*  Freedman forwarded this e-mail message to Plaintiff

94      the next day, with a note stating *Please share with staff, as appropriate*...

95      *CONGRATULATIONS!!*  (P.Ex. E)

96      f.   Freedman personally sent an e-mail message to members of Plaintiff's staff

97      on January 28, 2000, indicating that Plaintiff would continue to serve as

98      Acting Director *Finance and Debt.*  (P.Ex. F)  This was a clear indication not only of

99      Freedman's continued confidence in the work Plaintiff was doing, but also was reflective

100     of the confidence the staff assigned to Plaintiff had in working with Plaintiff, and also

101     was reflective of Plaintiff's positive working relationships with other managers both

102     inside and outside the Treasury OIG.

103     g.   Freedman sent Plaintiff a number of e-mail messages that provide evidence that

104     Freedman was Plaintiff's first line supervisor during the period August 29, 1999, through

105     March 11, 2000, and that she was pleased with the work that Plaintiff was doing.

---

[14] From a telephone discussion with Freedman on March 9, 2000, it is Plaintiff's understanding that Dennis Schindel was the approving official for the award.  Freedman told Plaintiff that Schindel was very pleased with the audit, and that it took 5 minutes or less of conversation for a decision to be made.  Freedman stated that *it was not a hard sell*, which differed from other recommendations for award that she had put through, which Schindel had kicked back one or more times (lowered amount, not granted).

106    These e-mail messages contain Freedman's comments to this effect, including the

107    following examples (P.Ex. G).

108    - *I did want to let you all know that I was very pleased with* (sic) *briefing you all*

109    *gave to Mr. Rush.*[15]  *You did a great job!!* ☺  (12-10-1999)

110    - *Once again, great job yesterday!!*  (01-06-2000)

111    - *Good job!!... Thanks for the quick/quality turn around!!*  (02-07-2000)

112    - *This looks good to me.* (02-25-2000)

113    - *I am not completely through it yet...so far, it looks pretty darn good!*  (03-02-2000)

114    **Question 1**.  Please explain your role in informing Ms. Carmona that she was denied office

115    space and furniture relating to the office move.   [#14, D.Ex. 4, Pg. 2]

116    Freedman's Response (partial):

117    *...(I have attached the drawing of the floor plan that we used to assign space.)  Shortly,*

118    *after moving into her new office, she told me that she measured her office in comparison*

119    *with the one next to it, which was assigned to Alex Best ..., claimed that Mr. Best's was*

120    *some number of inches larger, and asked to be switched. ...Alex Best had already*

121    *unpacked his things.* [#14, D.Ex. 4, Pg. 3]

122    It is a false statement that Plaintiff told Freedman that she measured her office.  Plaintiff did

123    not make this statement; in fact, Plaintiff never measured either the office assigned to her or the

---

[15] Mr. Rush was the Inspector General for the Department of the Treasury at the time.  The term *you all* refers to
Plaintiff as the Acting Director and to three members of her staff at that time.

124 office next to it, assigned to Best. In addition, at the time Plaintiff first raised the issue regarding

125 the assignment of office space and furniture, both offices were vacant.[16] (P.Ex. I)

126     In her *Declaration*, Freedman also stated that ***The determination of office space was based***

127 ***on seniority (time-in-grade/length of service), for the most part. There were some exceptions***

128 ***because we tried to keep (1) disruptions to a minimum and (2) related Directorates together as***

129 ***best we could.*** [#14, D.Ex. 4, Pg. 3] Plaintiff does not believe that either of the stated criteria for

130 exceptions are valid. There were numerous moves during that time period, as discussed in

131 Plaintiff's twelfth formal administrative EEO complaint,[17] with some employees changing

132 offices as described in Freedman's own words in a December 28, 2000, e-mail message

133 (P.Ex. H), as follows.

134     *With Kathy... leaving the OIG, we have her old office available for occupancy. The*
135     *following folks will have the opportunity to move based on time-in-grade and length of*
136     *service. ... The way this will work is that Maria has the option to move into the office vacated*
137     *by Kathy. If Maria takes the office vacated by Kathy, Ed would have the option to move into*
138     *Maria's office. If Maria opts to stay where she is, then Ed would have the option to move*
139     *into the office vacated by Kathy. Once Ed makes his decision with respect to office space,*
140     *George's options would come into play..and so on, and so on. Once all "opts" are*
141     *completed, we should have another empty office somewhere. Once we know where it is, we*
142     *will repeat the procedure above with a group of 13s.*

143     Clearly such moves would not, as Freedman stated, ***keep (1) disruptions to a minimum***

144 ***and (2) related Directorates together***. Additionally, staff from different Directorates <u>were not</u>

145 situated together at the time, and the two offices at issue, those assigned to Best and to Plaintiff,

---

[16] Please note that Plaintiff did not ask to move. Prior to a required move from one building to another, Plaintiff had in fact asked to be assigned office space and furniture commensurate with her position in the OIG in accordance with established criteria. (P.Ex. I)
[17] Plaintiff's twelfth formal administrative EEO complaint was assigned case number TD 01-1155. Plaintiff will submit a copy of this complaint in its entirety as P.Ex. 2 in her *Opposition to Defendant's Motion to Dismiss or for Summary Judgment*, which is to be filed on or before April 18, 2006. It is noted that Defendant filed an incomplete copy of this complaint in his *Motion to Dismiss or for Summary Judgment* [#14, D.Ex. 1].

146    were located right next to each other. Freedman's statement that Best had already unpacked

147    (which, as stated above, was not true when Plaintiff first raised the issue of space) is therefore

148    merely pretext on the part of Treasury OIG management. Plaintiff asserts that Freedman knew

149    that Best was going to be promoted, i.e., had been preselected for promotion to the Grade 15, and

150    assigned him better, more professional office space and furniture prior to his actual selection.

151        Freedman's Response to Question 1 (partial, continued):

152    *Since then,[18] Ms. Carmona has been given two opportunities to move into larger office*

153    *space and declined both offers. The first time she was offered larger space was in*

154    *November 2001, and (sic) second was in May 2002.... Since she declined both offers,*

155    *I assumed she was happy with her space.*

156        These statements misrepresent what occurred. First, it should be noted that Freedman

157    was fully aware prior to those times that Plaintiff was not *happy with her space*, as evidenced

158    in part in a January 16, 2001, e-mail message (P.Ex. J) in which Plaintiff advised Freedman that

159    she had been forced to file her twelfth formal EEO complaint on December 18, 2000, and

160    specifically mentioned assignment of office space as one of the claims in the long-term pattern

161    and practice of discrimination, retaliation, and hostile work environment to which Plaintiff had

162    been subjected. Plaintiff also stated that following the completion of a full, complete, fair, and

163    objective investigation into all of her claims, as stated in her formal EEO complaint, she would

---

[18] *Since then* seems to refer to the point in time in which Plaintiff was denied the opportunity to be assigned office space and furniture in keeping with the designated criteria. Item (1) on Pg. 2 of Freedman's *Unsworn Declaration Under Penalty of Perjury* of July 19, 2002 [#14, D.Ex. 4], gives the date September 26, 2000, which is the date that Plaintiff is using in responding to Freedman's false statement.

164   be in a better position to address a fair and equitable resolution to the assignment of office

165   space.[19]

166      It should also be noted that Freedman's offers were part of mass office moves at the time,

167   which, as such, were not directed solely at Plaintiff; and that no offer was presented to Plaintiff

168   as resolution to the issues that Plaintiff had raised in her twelfth formal administrative EEO

169   complaint. In fact, as evidenced in e-mail messages dated December 28, 2000, and February 07,

170   2001 (P.Ex. H), Freedman made offers to groups of people, including Plaintiff. Also, as these

171   messages illustrate, the first offer was not in November 2001, and the second was not in

172   May 2002, as Freedman stated.

173   **Question 5.** Are you aware of Ms. Carmona's involvement in the EEO complaint process?

174   If so, when did you become aware and how? [#14, D.Ex. 4, Pg. 4]

175     Freedman's Response (partial):

176     *I became aware of Ms. Carmona's involvement in this complaint on June 17, 2002....*

177   This is a false statement. As mentioned above, in a January 16, 2001, e-mail message (P.Ex. J),

178   Plaintiff advised Freedman that she had been forced to file her twelfth formal EEO complaint on

179   December 18, 2000, and specifically mentioned assignment of office space as one of the claims

180   in the long-term pattern and practice of discrimination, retaliation, and hostile work environment

181   to which Plaintiff had been subjected. Thus, Freedman became aware of Plaintiff's involvement,

182   and the extent of that involvement in the complaint process (and by extension, Plaintiff's eleven

---

[19] Once the EEO process had begun, Plaintiff decided not to change offices, in part because the office space she had been assigned was evidence to be developed in her administrative EEO complaint, and because moving would have been disruptive to Plaintiff's ongoing work assignments.

183    previously filed formal EEO complaints), almost a year and a half earlier than the *June 17, 2002,*

184    date that Freedman has claimed.

185    **Question 8.** Are there any other witnesses who would have relevant information about this

186    claim?  Who?  What?  [#14, D.Ex. 4, Pg. 5]

187    Freedman's Response (partial):

188    *...Geroge Taylor....*

189    Plaintiff is not aware of anyone by this name, and would need further information from the

190    Defendant before responding to this.

191    **Question 4.**[20]  Explain why you selected the employee you did and why you did not select

192    Ms. Carmona.  [#14, D.Ex. 4, Pg. 6]

193    Freedman's Response (partial):

194    *...I considered the relevancy of Mr. Best's experience.  In addition, to working in the*

195    *Enforcement audit area for sometime, he had direct prior work experience with one of our*

196    *law enforcement bureaus....*  [*id.*, Pg. 7]

197    In this instance, Freedman's *Declaration* is purposefully deceptive by what it fails to include;

198    which is that while an employee of the Treasury OIG Plaintiff had long-term experience dealing

199    with the Treasury law enforcement bureaus and with Treasury Offices with law-enforcement

200    missions, including the Bureau of Alcohol, Tobacco and Firearms, the U.S. Customs Service,

201    the Internal Revenue Service, the U.S. Secret Service, the Financial Crimes Enforcement

202    Network (FinCEN), and the Executive Office of Asset Forfeiture, as presented in Plaintiff's

---

[20] As mentioned earlier, the same question numbers are used more than once in Freedman's *Declaration*.  It is for this reason that the question numbers do not appear in sequence in this *Plaintiff Statement*.  Corresponding page numbers are also provided for this reason.

203   application for this position.[21] (P.Ex. K)  Plaintiff's experience in this area included work that

204   Plaintiff did for the Treasury OIG while assigned to the Office of Oversight and Quality

205   Assurance, the Investigations Directorate, and the Office of Audit, including its Offices of

206   Program Audits and of Financial Management Audits, for a period that began in December 1989

207   and ended in August 1999,[22] which is clearly a significantly long-term period of experience that

208   Plaintiff had with the Treasury law enforcement bureaus. (P.Ex. K, Pgs. 10-17)  Plaintiff asserts

209   that she had significantly more and more-varied experience than the selectee, Best.

210       Also, as Plaintiff points out in her fourteenth formal administrative EEO complaint,[23]

211   Best was given an opportunity that Plaintiff was not, to serve as Acting National Director for

212   Enforcement Audits.  (See P.Ex. L for an excerpt from this complaint, with reference to the

213   pages numbered 10 and 11.)   In addition, Best stated that Freedman wanted to name someone

214   other than him as Acting because when the subsequent selection was made there could be

215   grievances filed if Best had been Acting the whole time.  Best further stated that Freedman feels

216   that it would look better if someone other than Best was Acting for a while, so that no one could

217   claim preselection when Best was selected to the position.  (P.Ex. L, page numbered 10)

218   It should be noted that Plaintiff requested admission of these statements by Best, but Defendant

219   was nonresponsive.  [Ref. 04cv0589 (JGP), #62, Exhibit B, Item 5.b. under *Requests for*

220   *Admission.*]  These statements by Best clearly serve as further evidence of preselection.

---

[21] In her *Declaration*, Freedman stated that ***The entire package that each employee submitted during the application process was taken into account.*** [#14, D.Ex. 4, Pg. 6]

[22] From May 1993 through October 1993, Plaintiff served as Acting Director for Quality Assurance, which focused on the quality of the work performed by the Treasury OIG rather than on the law enforcement bureaus.

[23] Defendant did not assign individual complaint numbers to the thirteenth, fourteenth, fifteenth, or sixteenth formal administrative EEO complaints that Plaintiff filed.  These four EEO complaints and Plaintiff's twelfth EEO complaint, assigned TD 01-1155, are all subjects of this civil action.  Copies of these five complaints will be provided as P.Ex. 2-6 in Plaintiff's *Opposition* to be filed on or before April 18, 2006.

221    <u>Freedman's Response to Question 4 (partial, continued):</u>

222    ***In general Mr. Best has consistently come through on every task to which he's been***

223    ***assigned. ...he led the President's Committee (sic) on Integrity and Efficiency (PCIE)***

224    ***government-wide audit of debt collection improvement act results. ... I should also***

225    ***point out that as difficult as it was, all timeframes were met on that assignment.***

226    [#14, D.Ex. 4, Pg. 7]

227    These are false statements.  Freedman knows that these are false statements because

228    Freedman was Best's direct supervisor for this PCIE project,[24] and was also a recipient

229    of monthly audit status reports that showed that the time frames were not met.

230    As direct evidence:

231        a.  The *Office of Inspector General Audit Status Report* dated 01/01/00 (P.Ex. M) clearly

232            shows that not all of the time frames were met on the *PCIE*[25] *Review of Non-Tax*

233            *Delinquent Debt,* to which this section refers.  Specifically, the following time frames are

234            shown as not met:  complete field work, agency report for comment, summaries of

235            findings/recommendations, PCIE roll-up report-comment, and PCIE roll-up report-final.

---

[24] Plaintiff first became involved with the PCIE project as a reviewer of the four draft reports during September 1999, shortly after Plaintiff became the Acting Director, Office of Finance and Debt. (P.Ex. N-Q) The *Audit Status Report* (P.Ex. M) shows that the project began during October 1998.

[25] This audit was done under the auspices of the PCIE/ECIE; that is, the President's Council on Integrity and Efficiency (PCIE) and the Executive Council on Integrity and Efficiency (ECIE). Often, the term *PCIE* alone is used as a short-cut even though the intended reference is to both entities.

236    b.  In addition, Freedman was aware of serious concerns regarding Best's management of

237         this PCIE audit, including but not necessarily limited to the following.

238             First, the audit objectives were not met.

239                 Best himself stated to Plaintiff during a discussion on September 10, 1999, that

240                 the objectives of the audit had not been met.  (P.Ex. N, Pg. 3)

241                 During a discussion between Plaintiff and Freedman shortly after, it was

242                 established that a decision had been made, prior to Plaintiff becoming involved in

243                 the audit as Acting Director, Finance and Debt, to remain silent on the fact that

244                 the audit objectives had not been met.[26]  (id., Pg. 4)

245             Second, the audit work performed was not properly controlled and progress was not

246         properly monitored by the Treasury OIG.

247                 Best did not ensure that audit steps were consistently performed by the

248                 participating Offices of Inspector General.  This allowed only for the reporting of

249                 varying data for each entity rather than for a true consolidation of the results.

250                 For example, statistical sampling was not used and the extent of work performed

251                 varied widely among the different OIGs.  Also, the percentage of debt that was

252                 tested could not be determined. (id., Pg. 3)  In addition, progress was not

253                 monitored in a manner that ensured that all of the other offices issued their reports

---

[26] If additional evidence of these serious concerns regarding the quality of Best's work, and by extension of Freedman's false statements, is necessary, Plaintiff can provide a copy of the audit report and demonstrate that the report does not show that the stated audit objectives were met.  The stated objectives were to (1) determine whether the reported $60 billion in non-tax delinquent debt accurately represents the universe of non-tax delinquent debt and (2) assess the collectibility of the delinquent debt.

254          by the due date, thereby causing the PCIE summary report to be issued late.

255          (P.Ex. M)

256          Third, there was a failure to adhere to the supervision requirements of the

257          *Government Auditing Standards*, which are the professional standards that govern the

258          audit work performed by the Treasury OIG.

259          Best signed as both preparer and reviewer on many of the working papers.[27]

260          (P.Ex. N, Pg. 4)  Freedman herself expressed concern about this to Plaintiff,

261          stating *...As to the same person reviewing workpapers as preparing them,*

262          *I am not happy to hear about that!*  Freedman also requested a proper supervisory

263          review.  (P.Ex. Q)[28]

264          Fourth, there was a failure to adhere to Treasury OIG policy and practice.

265          Specifically, there was a failure to have proper supervisory review, as discussed

266          above, and procedures that help ensure the quality of audit work and reports were not

267          followed.

268          Best failed to have the reports indexed and referenced[29] prior to issuance in draft.

269          (P.Ex. N, Pg. 4)

---

[27] The term *workpapers* is frequently used instead of *working papers*, the term used in the *Government Auditing Standards*.

[28] It is noted that in her October 05, 1999, e-mail message to Plaintiff, Freedman stated *On the audit objectives, I think Alex may have misspoken.  I believe the objectives were met and our reporting on them is more of a matter of samantics (sic).*  This in itself is a false statement by Freedman, as explained under the heading *First, the audit objectives were not met* under **Question 4**, *Item b* in this document.

[29] Treasury OIG policies and procedures require *indexing* and *referencing* to ensure the quality of all audit reports. Indexing is a procedure that ties statements in an audit report back to supporting documentation in the files. Referencing is the independent checking of the accuracy of an audit report, in part by verifying that the supporting documentation identified during the indexing process does indeed support the statements in the report.  Referencing is generally done by a senior experienced member of the OIG staff who did not have any involvement in the audit.

270        Fifth, the reports contained factual errors and inconsistencies.

271            As Acting Director, Finance and Debt, Plaintiff performed a comprehensive

272        review of the reports and prepared detailed comments, some of which[30]

273        she provided to Freedman via e-mail as follows:

274            - on September 10, 1999, for the PCIE Summary report (P.Ex. O);

275            - on September 15, 1999, for the PCIE Customs report (P.Ex. P); and

276            - on October 05, 1999, as an update on concerns on the four PCIE audit

277                reports (P.Ex. N).[31]

278    It is indisputably clear, as demonstrated above, that Freedman was aware of all of the

279    concerns with the quality of Best's management/audit work.

280        The fact that Best was selected for promotion by Freedman without regard to these serious

281    lapses in Best's managerial performance, such as not meeting audit objectives, not adhering to

282    professional standards or to OIG policies and procedures, signing as preparer and reviewer on

283    workpapers, not properly controlling the work, and drafting reports that contain factual errors, is

284    further indicative of Best's preselection for promotion to the Grade 15 and of the pretextual

285    reasons proffered by Treasury OIG management for not selecting Plaintiff.  Also, as discussed

286    above, Best was given preferential treatment in the assignment of office space and furniture prior

287    to his promotion to the Grade 15, another indication of his preselection for promotion.

---

[30] Other comments were made on copies of the reports or shared with Best verbally or by e-mail.

[31] The automated read receipts included with P.Ex. N, O, and P, provide evidence that Freedman read each of these messages on the same day that Plaintiff sent them.

288    Freedman's Response to Question 4 (partial, continued):

289    ***Also, I did give consideration to a number of unsolicited positive/supportive comments***

290    ***provided to me by peers and subordinates of Mr. Best....*** [#14, D.Ex. 4, Pg. 7]

291    Plaintiff questions whether any ***unsolicited comments*** were in fact made, as no evidence of

292    the number and/or contents of the purported comments has been placed on the record. Plaintiff

293    questions the validity of the purported unsolicited comments, and certainly questions the use of

294    any such comments in evaluating applicants, as follows.

295    The vacancy announcement for the position stated the criteria to be used in evaluating

296    applicants for the position, and unsolicited comments were not stated as criteria. Further, it is

297    not equitable to consider the comments of the peers and subordinates of one candidate without

298    considering the same element for other candidates. By stating that she did this, Freedman is

299    admitting to preferential treatment of one applicant (Best) in violation of the Merit System

300    Principles. Plaintiff asserts that this action/statement by Freedman, in addition to being a clear

301    violation of the Merit System Principles, is another example of pretext used by Treasury

302    management to deny Plaintiff a merited promotion.

303    If the validity of these purported ***unsolicited comments*** is to be considered further, Defendant

304    should provide identification of, and sworn statements by, each individual attesting to the

305    specific content of his/her comments and certifying that his/her comments were truly unsolicited;

306    that is, that neither Freedman nor Best, nor any other individual, requested, implied, or by any

307    other means suggested that these comments be made. Plaintiff would then call these individuals

308    as witnesses at trial to further explore perjury and more violations of the Merit System Principles

309    by Treasury management.

310  Freedman's Response to Question 4 (partial, continued):

311    ***Finally, while Ms. Carmona's work is thorough, it is generally not as timely as the work of***

312    ***others at her grade level.***  [#14, D.Ex. 4, Pg. 7]

313        There are a number of indications that this statement is false, and that Freedman in fact

314    considered Plaintiff's work to be done in a timely manner, as discussed below.[32]

315    a.  In the performance appraisal Freedman gave Plaintiff on June 20, 2000, Freedman gave

316        an *Acceptable* rating[33] to two elements that required timely work, as follows.  (P.Ex. B)

317        -  Element #2, *Planning and Performing Audit Work*, which includes the following

318            requirements:  *Completes audits, segments of audits or specific audit steps in a timely*

319            *and effective manner* and *Meets milestones and deadlines in accordance with project*

320            *needs*; and

321        -  Element #3, *Planning and Performing Staff Work*, which includes the following

322            requirements:  *Consistently delivers completed staff work on time* and

323            *Meets milestones and deadlines in accordance with project needs.*

324    b.  In discussing Plaintiff's assignment as Acting Director (see Lines 38-42 and 62-80 of this

325        document), Freedman told Plaintiff that she did an *exceptional job,* kept on top of

326        everything, and always turned things in on time or early.  An attachment to the

327        performance appraisal, the *Statement of Significant Accomplishments* for the period

328        August 29, 1999, through March 11, 2000, during which Plaintiff served as Acting

---

[32] It must be noted again that Freedman's statement that ***all timeframes were met*** on Best's PCIE work has been shown to be false.  See *Item a* under **Question 4** above.

[33] The available rating levels at that time were *Acceptable* and *Unacceptable*.  Plaintiff questions the use of what is essentially a pass/fail rating standard because it provides no objective differentiation among candidates, leaving open the possibility of being able to preselect and ultimately choose candidates who may not have demonstrated the highest levels of performance, i.e., merit, when compared to other candidates for promotions/awards/etc.

329      Director, Finance and Debt, includes a *Listing of Audit Reports* (P.Ex. B, last page) that

330      indicates that Plaintiff was responsible for the issuance of seven reports in final, with

331      two additional reports pending management review. Freedman was very complimentary

332      of Plaintiff's efforts in issuing these reports.

333    c.   Freedman gave Plaintiff a *Special Act Award*[34] (P.Ex. D) for work performed during the

334      August 1999 to March 2000 time frame. The award justification contained the following

335      language indicative of the importance of the work and the timely manner in which it was

336      performed.

337        *This was a high-visibility audit, requested by the Treasury General Counsel in the*

338        *context of pending litigation relating to the Individual Indian Monies trust fund,*

339        *which received considerable media coverage during 1999. The work was performed*

340        *in an expeditious manner, with the on-site audit fieldwork completed in a 3-month*

341        *period, with limited staffing.* (P.Ex. D, Pg. 1)

342    d.   Freedman continued to be in Plaintiff's chain of command after March 11, 2000,

343      and knew about the performance appraisals, awards, and quality increases that Plaintiff

344      received between that date and the time Freedman purportedly executed her *Declaration*

345      on July 19, 2002. Also, as the selecting official for the position to which Best was

346      selected, Freedman would have been aware of recognition that Plaintiff received in prior

347      years that was reflected in Plaintiff's application package (P.Ex. K), as follows.

---

[34] Although the *Certificate of Appreciation for Special Act* does not include a *Team* designation, awards were given to members of a team for completion of an audit that identified approximately $42 million in funds that should be put to better use. Plaintiff was the Acting Director responsible for issuance of the audit report. As mentioned above, three members of Plaintiff's staff also received an award. (P.Ex. D)

348         Specifically, Plaintiff received an *Exceptional Performance*[35] rating for the period

349    June 1, 2000, through June 30, 2001[36] (P.Ex. K, Pgs. 36-46).  This included an

350    *Exceptional* rating for the category of *Customer Service* (*id.*, Pg. 41), which has as a

351    performance measure *consistently completes assignments for customers in advance of*

352    *established deadlines*; and for the category of *Teamwork* (*id.*, Pg. 42), which has as a

353    performance measure *takes initiative to ensure early or timely completion of team*

354    *assignments*.  In addition, Plaintiff's rating official at that time provided numerous

355    comments regarding the timeliness of Plaintiff's work (*id.*, Pg. 43).

356         Plaintiff received a *Quality Increase* effective August 26, 2001. (*id.*, Pg. 35)

357    It has been Plaintiff's experience[37] that such an award is reserved for special situations,

358    as it represents a permanent increase in salary.

359         As the selecting official, Freedman had Plaintiff's application package (P.Ex. K),

360    which included copies of the above, and also evidence of prior recognition, such as

361    a *Notification of Personnel Action* for another *Quality Increase* effective September 27,

362    1998 (*id.*, Pg. 49); a *Certificate of Appreciation for Outstanding Performance* for the

363    period June 1, 1997, to May 31, 1998 (*id.*, Pg. 47); and a *Notification of Personnel Action*

364    for a *Special Act or Service Award* effective May 31, 1998 (*id.*, Pg. 48).

---

[35] At that time, there were four rating categories available, with *Exceptional Performance* being the highest. (P.Ex. K, Pg. 36)
[36] This performance period lasted 13 months instead of the usual 12 months so that subsequent appraisal periods would coincide with calendar quarters, i.e., begin on July 1 and end on June 30.
[37] Plaintiff first joined the Treasury OIG during 1983.

365    **Question 11.**  Have you made other selections and/or recommendations within the last two

366    years?  Do you know the EEO categories of those selectees as to sex, national origin and/or age?

367    [#14, D.Ex. 4, Pg. 9]

368    Freedman's Response (partial):

369        *I don't know the national origin of any of the selections.*

370        Plaintiff asserts that this is a false statement.  As a senior management official[38] Freedman

371    knew (Ref. discussion beginning at Line 388 below) whether each of the individuals selected

372    was, or was not, of Hispanic national origin.

373        In addition, Plaintiff believes that the statements that Freedman makes denying that sex, age,

374    national origin, and retaliation played a role in her decisions are not true, and wants the

375    opportunity to call Freedman before a jury to further explore this issue.  These statements by

376    Freedman in her *Declaration* [#14, D.Ex. 4] are given in response to Question 3 on Pg. 4,

377    Questions 7 and (2)(a) on Pg. 5, and Questions 15 and 16 on Pg. 10.  Similarly, Freedman's

378    response to Question 1 on Pg. 10 that *management has unequivocally NOT manipulated the*

379    *personnel system in violation of the merit system principles* is false based on clear and

380    indisputable evidence presented herein and requires further exploration by calling witnesses

381    before a jury.  Freedman's response, offered in the context of whether hiring and promotion

382    practices have adversely impacted Hispanic Females over age 40 in regard to selections for

383    senior management positions, can be called into question when management consistently

384    promotes males to these positions, as Freedman stated was done in the three selections in

385    which she stated she had a role within a 2-year period [#14, D.Ex. 4, Pg. 9, Question 11].

---

[38] Freedman was and is part of the Senior Executive Service (SES).

386    Plaintiff has asserted that Defendant has never permanently promoted a Hispanic Female

387    in the 511 series beyond the Grade 14 in the Treasury OIG.

388         In direct response to Freedman's statements above, i.e., *I don't know the national origin of*

389    *any of the selections,* and *management has unequivocally NOT manipulated the personnel*

390    *system in violation of the merit system principles,* evidence clearly shows that Defendant and

391    his managers and supervisors, by Defendant's own policy and by law, were required to know the

392    national origin, sex, and age of their employees;[39] and were not only required to know of

393    Plaintiff's Hispanic national origin, but were in fact required to take appropriate action to ensure

394    Plaintiff's right to equal employment opportunity, as follows.

395         Treasury Directive 62-01, *Equal Opportunity Programs*, dated January 29, 1987, specifically

396    provides for an Hispanic Employment Program, at 4.b., and a Women's Executive Leadership

397    Program, at 4.c.(2)(b).  Treasury Directive 62-02, *Safeguard and Notification Requirements for*

398    *Treasury Race and National Origin (RNO) Data,* dated January 29, 1987, states in Section 3.a.,

399    *The Department of the Treasury maintains RNO data for all employees in accordance with*

400    *applicable law and regulations issued by the Office of Personnel Management and the Equal*

401    *Employment Opportunity Commission.*  It is clear from these two Treasury Directives issued in

402    1987 that management and supervisors at Treasury, to certainly include those at the Treasury

403    OIG, were aware of Plaintiff's Hispanic national origin, sex, and age; and that Treasury

404    management and supervisors were to use this knowledge in order to properly implement

405    Treasury's equal employment opportunity policy and program and other relevant programs.

---

[39] As further clarification, Plaintiff first joined the Treasury OIG during 1983.  Plaintiff's sex, age, and national origin have been part of Plaintiff's official personnel records since 1976, when Plaintiff first started working for the Federal Government.

406    In addition, Part 1614, *Federal Sector Equal Employment Opportunity* under *Subpart A--*

407    *Agency Program to Promote Equal Employment Opportunity,* 1614.102, *Agency Program,*

408    provides the responsibilities of an agency regarding equal employment opportunity.

409    Plaintiff wishes the Court to especially note the following relevant requirements:

410    • Section 1614.102(a)(5). *Review, evaluate and control managerial and supervisory*

411        *performance in such a manner as to insure a continuing affirmative application and*

412        *vigorous enforcement of the policy of equal opportunity, and provide orientation,*

413        *training and advice to managers and supervisors to assure their understanding and*

414        *implementation of the equal employment opportunity policy and program;*

415    • Section 1614.102(a)(6). *Take appropriate disciplinary action against employees who*

416        *engage in discriminatory practices;* and

417    • Section 1614.601 *EEO group statistics* (a). *Each agency shall establish a system to*

418        *collect and maintain accurate employment information on the race, national origin, sex*

419        *and handicap(s) of its employees.*

420    Freedman's above-stated denials in light of the law and the above discussion directly

421    implicates Defendant, the Secretary of the Treasury, and other official of the United States

422    Government in these matters.

423    Plaintiff wishes to question Freedman and other officials of the United States Government

424    under oath before a jury for additional evidence regarding their compliance with the laws, rules,

425    and regulations governing, and their commitment to, equal employment opportunity.

426    This *Plaintiff Statement* provides clear evidence of false statements material to Plaintiff's

427    case in AIGA Marla A. Freedman's *Unsworn Declaration Under Penalty of Perjury* purportedly

428    executed July 19, 2002.

429    Plaintiff asserts that these material false statements by Freedman were made willfully,

430    knowingly, and with the intent to misrepresent and deceive.  The fact that Freedman has made

431    these false statements indisputably proves that the reasons given for the adverse actions taken

432    against Plaintiff, including non-selection for promotion, were pretextual; and provides

433    indisputable material evidence in support of Plaintiff's overarching claim of a long-term pattern

434    of discrimination, retaliation, disparate treatment, and a hostile/harassing work environment.

435    Briefly and further in these regards, Plaintiff also wishes to note that Freedman's first line

436    supervisor was and is Dennis Schindel,[40] current Deputy Inspector General, the senior Treasury

437    management official that Plaintiff has identified as the person most responsible for Plaintiff

438    being forced, to date, to file nineteen formal administrative EEO complaints and four civil

439    actions against Defendant in pursuit of her civil right to equal employment opportunity.

---

440    In conclusion, Plaintiff respectfully requests that the clear and indisputable pattern and

441    practice of senior management officials of the Department of the Treasury knowingly making

---

[40] Schindel, like Freedman and many others throughout Plaintiff's over 20-year career with the Treasury OIG, was also very complimentary of Plaintiff's work when he was Plaintiff's first line supervisor for a period in 1991 [04cv0589 (JGP), #16, P.Ex. C-2 (3 pages)].  Schindel, as a senior Treasury management official, has had direct knowledge of Plaintiff's work ethic and high-level of performance since at least 1991, and has been in a position to influence Plaintiff's career since that time.

442    material false statements in this case and in related case 04cv0589 (JGP)[41] be referred by the

443    Court for investigation and criminal prosecution.

444        This *Plaintiff Statement Regarding Defendant's False Statements and Perjury*

445    *Before the Court* comprises this 26-page statement, a 2-page listing of Plaintiff's exhibits,

446    P.Ex. A-Q comprising 102 pages, and a certificate of service.  All are attached hereto.

                                            Respectfully Submitted,


                                            *Maria V Carmona*
                                            Maria V. Carmona, *pro se*
                                            8306 Haven Hill Court
                                            Laurel, Maryland  20723
                                            (301) 490-4328

---

[41] Plaintiff notes that no personal statements were provided by Defendant in 01cv0115 (CKK), that discovery was not granted and a trial was not conducted in that case, and that Plaintiff's filing of her *Opposition to Defendant's Motion To Dismiss or for Summary Judgment* in related case 05cv2428 (JGP) is pending.

## PLAINTIFF'S EXHIBITS

A     Notification of Personnel Action for Plaintiff's promotion to a GM-0511-15 Supervisory Auditor position effective 08/29/99 (1 page)

B     Performance Evaluation of Plaintiff by Freedman, 06/20/00 (6 pages)

C     Notification of Personnel Action for Plaintiff's performance award (cash award) effective 07/17/00 (1 page)

D     Documents for Special Act Award for August 1999 to March 2000 time frame (5 pages)

E     E-mail message of April 12, 2000, regarding processing of Special Act Award (1 page)

F     E-mail message of January 28, 2000, from Freedman indicating that Plaintiff would continue to serve as Acting Director *Finance and Debt* (1 page)

G     E-mail messages from Freedman to Plaintiff praising work (5 pages)

H     E-mail messages from Freedman regarding office moves (4 pages)

I     E-mail message from Plaintiff to Director regarding assignment of office space and furniture (1 page)

J     E-mail message of January 16, 2001, from Plaintiff to Freedman regarding assignment of office space and furniture and the filing of Plaintiff's twelfth formal EEO complaint (3 pages)

K     Plaintiff's application of November 30, 2001, for Announcement Number OIG-01-044, Supervisory Auditor, GS-511-15 (1-page cover memo plus 51-page application package)

L     Excerpt from Plaintiff's fourteenth formal administrative EEO complaint filed on May 7, 2002 (3 pages)

M     Office of Inspector General Audit Status Report dated 01/01/00 for the PCIE Review of Non-Tax Delinquent Debt (1 page)

N     E-mail message of October 05, 1999, from Plaintiff to Freedman regarding four PCIE/ECIE audit reports (4 pages)

O     E-mail message of September 10, 1999, from Plaintiff to Freedman regarding the PCIE/ECIE Summary audit report (7 pages)

P    E-mail message of September 15, 1999, from Plaintiff to Freedman regarding the PCIE/ECIE Customs audit report (6 pages)

Q    E-mail message of October 05, 1999, from Freedman to Plaintiff regarding PCIE/ECIE audit reports (1 page)

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that service of the foregoing

**PLAINTIFF STATEMENT REGARDING DEFENDANT'S FALSE STATEMENTS AND PERJURY BEFORE THE COURT**

was sent first class mail

this 17th day of April 2006 to:


Beverly M. Russell
Assistant U.S. Attorney
Judiciary Center Building
555 Fourth St., N.W., Rm. E-4915
Washington, D.C.  20530
(202) 307-0492



J. Steven Elbell
8306 Haven Hill Court
Laurel, Maryland  20723
(301) 490-4328